836 So.2d 494 (2002)
STATE of Louisiana
v.
Craig S. PARENT.
No. 02-KA-835.
Court of Appeal of Louisiana, Fifth Circuit.
December 30, 2002.
*497 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Assistant District Attorney, Gretna, LA, for Plaintiff-Appellee.
Craig S. Parent, In Proper Person, Angola, LA, for Defendant-Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., SOL GOTHARD and WALTER J. ROTHSCHILD.
EDWARD A. DUFRESNE, JR., Chief Judge.
The Jefferson Parish District Attorney filed a seven count bill of information charging defendant, Craig Parent, with unauthorized entry of an inhabited dwelling occurring on February 19-20, 2000, LSA-R.S. 14:62.3 (count 2), unauthorized use of a motor vehicle occurring on February 19-20, 2000, LSA-R.S. 14:68.4 (count 3), simple burglary occurring on March 23, 2000, LSA-R.S. 14:62 (count 5), extortion occurring on March 18, 2000, LSA-R.S. 14:66 (count 6), and three counts of intimidating a witness occurring on November 10, 1999, February 19-20, 2000, and April 2-3, 2000, LSA-R.S. 14:129.1 (counts 1, 4, and 7).[1]
The charges proceeded to trial before a twelve person jury which found defendant guilty as charged of all counts. The trial court sentenced defendant to five years at hard labor on each of counts 1,4, and 7, six years at hard labor on count 2, ten years at hard labor on count 3, twelve years at hard labor on count 5, and fifteen years at hard labor on count 6. The court ordered that all sentences be served consecutively to each other.
The state thereafter filed a multiple offender bill of information alleging defendant to be a third felony offender. Defendant denied the allegations, and after a hearing, the court found defendant to be a third felony offender. The court vacated the sentence as to count 6 of the bill of information, and imposed an enhanced sentence of thirty years at hard labor. The court ordered that the sentence run consecutively to the sentences previously imposed, and that the sentence be served without benefit of probation or suspension of sentence. Defendant now appeals.[2]

FACTS
Geralyn Lambert met defendant, Craig Parent, in January of 1999 when a co-worker *498 of Ms. Lambert, introduced them. Defendant worked as a building contractor, and Ms. Lambert asked him to inspect a house in New Orleans she wanted to buy. After looking at the house, defendant suggested that she look for something in a safer neighborhood. Defendant offered to help her find a suitable house, and the two spent a great deal of time looking at real estate together. With defendant's help, Ms. Lambert found a suitable house in Metairie. Ms. Lambert continued to see defendant after she moved into the new house, and the two soon became romantically involved.
Defendant suggested to Ms. Lambert that she convert her home's detached garage into an apartment that she could lease to earn extra money. He told her the cost would be five thousand dollars, and that if they worked together, they could finish the job within two weeks. Pursuant to defendant's persuasion, Ms. Lambert applied for a $25,000 loan which was finalized in July of 1999.
Ms. Lambert made incremental disbursements of cash to defendant as he incurred expenses on the project. Ms. Lambert soon became concerned about time and cost overruns. Defendant made excuses for the disappearance of building materials. He often asked her to pay the same bills more than once. When she questioned defendant about the extra money he requested, or asked for receipts for materials, he became furious. He used abusive language with her. Ms. Lambert testified that she became frightened of defendant. Also, in late July of 1999, an incident occurred between defendant and one of Ms. Lambert's neighbors, which caused Ms. Lambert to become even more fearful of defendant.
Ms. Lambert testified that she now wanted to end her connection with defendant as quickly as possible. The building project was still unfinished, and she urged defendant to complete it. Defendant responded that he could finish the job more quickly if she allowed him to stay at her house. He began to work into the night, and to sleep at Ms. Lambert's house. Ms. Lambert did not consider this a permanent arrangement, and defendant brought with him only a bag of personal belongings.
On November 2, 1999, defendant arrived at her house and demanded a great deal of money. The two began to argue. Ms. Lambert received a telephone call from her friend and co-worker, Melissa Barbier. Defendant flew into a rage when she answered the call, and took the telephone away from her. Defendant insisted that Ms. Lambert give him checks written to cash, then ordered her to write checks to some of the contract workers she knew had already been paid. When she refused, he grabbed her by the back of the neck and the arm, saying, "You know what I'm capable of. You're going to write those checks." He then called her a b* * *h and m* * * * * f* * * * *. Ms. Lambert testified that she believed defendant intended to seriously injure or kill her. She ran out of the house and stood in the street until Ms. Barbier arrived. Ms. Barbier advised her to call police. Ms. Lambert did not want to involve police, because defendant had told her that he had friends in law enforcement, and they would let him know if she made a report. At her friend's insistence, Ms. Lambert reluctantly called police to report the incident.
Out of fear of defendant, Ms. Lambert and her young son, Luke, began to stay at the Harahan home of her mother, Josephine Blanco. Ms. Blanco testified that defendant repeatedly telephoned her home, threatening to harm her, her daughter, and her grandson. Ms. Blanco was able to recognize defendant's voice, and saw his telephone number on her caller I.D. device. *499 Ms. Lambert would become frantic with fear when defendant called, and would promise not to call police if defendant would stop calling her. Ms. Lambert testified that when defendant called her at her mother's house, he threatened to set fire to her house, and to kill her and her son in the process. He also told her he would drown her in her mother's swimming pool. He threatened to call her son's father and tell him she was an unfit mother.
Officer Chris Graham of the Harahan Police Department testified that on November 10, 1999, he reported to Ms. Blanco's residence on a complaint of harassing telephone calls. Graham stated that Ms. Lambert was very shaken. She told him she had received numerous telephone calls from defendant during which he threatened to do her serious bodily harm or to kill her. While Graham was taking Ms. Lambert's statement, there were several calls from telephone number (504) 616-3554.[3] With each call, Ms. Lambert became more frantic. She told the officer, "This is him. This is his phone number."
At trial, defendant denied having threatened Ms. Lambert on November 10, 1999. He further denied having threatened to burn down Ms. Lambert's house.
Shortly after the events of November 10, 1999, defendant contacted Ms. Lambert several times to apologize. He said he did not mean what he had said, and that his actions had been prompted by his fear of losing her. Eventually, defendant regained her trust, and she agreed to go on a vacation trip with him to Lake Tahoe, although she insisted upon paying her own expenses. In December of 1999, while in Lake Tahoe, Ms. Lambert resolved to end the relationship permanently. She informed defendant of her decision; however, she relented when defendant called her in January of 2000, and told her he was ill due to alcohol abuse, and had only four to five months to live. She did not resume an intimate relationship with him, but she continued to speak to him by telephone.
On February 19, 2000, Ms. Lambert was again living at her own house. Her friend, Darlene Bennett, was visiting her from out of town. The two women returned to the house that night between 8:30 and 9:00 p.m. and observed defendant's truck parked on the side of the house. Ms. Lambert asked the woman seated in the truck the whereabouts of defendant. The woman responded that defendant had gone into the house. Ms. Lambert testified that defendant was not supposed to be inside of her house, and that she was angry. When Ms. Lambert and Ms. Bennett entered the house through the back door, they could hear someone exiting through the front door. They went back outside and saw that defendant was returning to his truck. Ms. Lambert asked him what he was doing at her house, and he did not respond. She attempted to hand him a basket of items he had left at the house, but he would not take it. He left the premises in his truck.
Ms. Lambert was upset and frightened by the fact that defendant had been in her house without permission. After locking the doors and covering the windows, Ms. Lambert and Ms. Bennett slept in the same bedroom. Some time later, a loud banging noise woke the women. Ms. Lambert testified that she heard defendant's voice, and that she and Ms. Bennett were frightened. When Ms. Lambert did not open the door, the banging grew louder. Ms. Lambert testified that defendant began to curse and make threats against her. *500 Defendant eventually walked away from the house, but returned a short time later.
This time he threw himself against the back door so forcefully that the wood surrounding the deadbolt began to break. Ms. Lambert felt that if he continued in this manner, he would kill her and Ms. Bennett. She stood in the kitchen and asked defendant to calm down so they could talk. She opened the door and started to go outside. Defendant pushed her back inside the house and into the kitchen counter. Defendant raged wildly, punching the kitchen cabinets, countertop, and refrigerator until his hands were bloody. He knocked over a large water cooler, spilling its contents onto the kitchen floor. Ms. Lambert testified that defendant threatened to kill her. Ms. Bennett telephoned police. Defendant demanded money and the keys to Ms. Lambert's Jaguar automobile. When she refused, defendant took the keys away from Ms. Lambert, left the house, and took her car.[4]
Sergeant Brady Buckley of the Jefferson Parish Sheriff's Office testified that at 12:02 a.m. on February 20, 2000, he and Deputy Chris Smith responded to a complaint of domestic violence. He observed that Ms. Lambert was extremely upset and was crying and shaking. He attempted to interview Ms. Lambert, but she was not cooperative. She told him she was afraid. Buckley interviewed Ms. Bennett, who recounted defendant's violent behavior and the fact that he had taken Ms. Lambert's car.
While Buckley was at Ms. Lambert's house, the telephone rang continuously. Buckley attempted to answer the calls, but Ms. Lambert would not allow it. Instead, Ms. Lambert spoke to the caller, assuring him she was not telling the police anything. Ms. Lambert testified that defendant described in lurid detail how he would kill her and Luke. Defendant said he would cut her throat in front of Luke, then leave him in the house with her rotting body.
Ms. Lambert refused to press charges against him at that time. Nevertheless, an officer from the Crime Scene Division photographed the damage to her house. Upon completing his investigation, Buckley drove Ms. Bennett to the airport in Kenner, and dropped Ms. Lambert off at Melissa Barbier's house. After Ms. Lambert and Ms. Bennett left the house, Mr. Lanaux, a neighbor who had witnessed the earlier incident, saw defendant return. Defendant used a piece of wood to break a window. Mr. Lanaux also saw defendant leave Ms. Lambert's car there. He reported this to police. After dropping off the two women, Sergeant Buckley returned to the house to investigate the additional damage.
Regarding the February charges, defendant testified that he called Ms. Lambert three times on February 19 and 20, 2000. He did not threaten or harass her. Rather, he told her that he loved her. He also testified that he had the authority to enter Ms. Lambert's house, because he resided there between July of 1999 and March of 2000.
Ms. Lambert further testified that, on March 18, 2000, defendant called her several times at her mother's house and demanded money. He used obscenities, and told her "You better meet me and give me whatever money you have." Defendant threatened that, if she did not give him the money, he would break her legs and Luke's legs, and that he would hurt other members of her family.
Officer Troy Rigby of the Harahan Police Department testified that on March *501 18, 2000, he and Officer Chris Graham responded to a complaint of harassing telephone calls. When he arrived, he observed that Ms. Lambert was frightened to the point of being frantic. She told him Craig Parent had called her ten times that day demanding money. Defendant told her that if he did not get the money, he was coming to get her. Defendant threatened to break down the door and break her legs, and said he would do the same to anyone who was with her.
Rigby testified that Ms. Lambert did not wish to press charges, as she was frightened of retribution from defendant. However, the officer met with Ms. Lambert at the Harahan Police Department on March 29, 2000, at which time he took a formal statement from her.
Defendant testified that, on March 18, 2000, he and Ms. Lambert argued on the telephone because she refused to move back into her house and live with him. Defendant told Ms. Lambert that if she did not repay money she owed him, he would place a lien on her house. She responded that if he did so, she would make sure he went to jail for the rest of his life.
Another incident occurred on March 23, 2000. On that day, Mr. Lanaux saw defendant go into Ms. Lambert's garage, and leave carrying property. Mr. Lanaux informed Ms. Lambert of what he had seen. She called police on March 28, 2000, to report the incident.
Deputy Brian Schuyler of the Jefferson Parish Sheriff's Office testified that he responded to the burglary call on March 28, 2000. Ms. Lambert reported to him that her neighbor, Mr. Lanaux, had seen defendant remove items from her garage. She showed the officer a lock on the garage that had been taken apart, and a window through which she believed defendant had gained entry. Ms. Lambert told Schuyler that defendant did not have her permission to enter the garage, or to take items stored there. She told the officer she wished to pursue charges against defendant. One of the items taken from the garage was an exercise bike that Ms. Lambert said defendant had given her as a gift.
Defendant testified that he entered the garage to retrieve some items belonging to him, including a hammer, a nail bag, and the exercise bike a friend had given him as a gift. He called Ms. Lambert first to notify her, and she told him he could pick up his belongings. She told him she did not want him to take the exercise bike, and he told her he was entitled to it, since it belonged to him.
On March 29, 2000, Deputy Schuyler took Mr. Lanaux's statement. During the interview, a man in a pickup truck drove past them. Mr. Lanaux told Schuyler and other officers at the scene that the driver of the truck was defendant. The officers followed defendant, stopped him, and placed him under arrest.
On March 29, Schuyler also took a statement from Ms. Lambert regarding defendant's ongoing harassing behavior toward her. Ms. Lambert stated that on that day alone, defendant had made 18 threatening telephone calls to her. On March 30, 2000, Ms. Lambert obtained a Louisiana Uniform Abuse Prevention Order, barring defendant from calling or contacting her or her family in any way.
Despite his arrest and the subsequent protective order, defendant made several calls to Ms. Lambert at her mother's home on April 2 and 3, 2000. Ms. Lambert testified that defendant said he was going to kill her and her son if she went forward with the charges against him. Defendant threatened to dismember Luke.
Ms. Blanco also testified that defendant called her home several times on April 2-3, *502 2000. If no one answered the calls, defendant left recorded messages. Defendant said, "You know you think you're scared now. You don't know what scared is." Defendant also told Ms. Blanco, "I'm coming after her. You tell her I'm coming to get her." Ms. Blanco heard Ms. Lambert tell defendant to stop threatening her family. She assured him that she would stop making reports to the police if he would stop calling. Ms. Blanco testified that the caller I.D. feature on her telephone showed the calls came from defendant's cellular telephone, a pay telephone, and the home of someone named Melvin Faucheaux.
Ms. Lambert reported the calls to the Harahan Police Department. When Captain Blanco arrived, Ms. Lambert appeared to be nervous and upset. She reported that she had received seven to ten threatening telephone calls, and that defendant had threatened her in a like manner numerous times in the past.
Regarding the April incidents, defendant testified that he stayed at Melvin Faucheaux's house April 2-4, 2000, but denied that he called Ms. Lambert during that time.
After listening to this evidence which was presented at trial, the jury found defendant guilty as charged of all seven counts.

ASSIGNMENT OF ERROR NUMBER ONE
In his first assigned error, defendant argues his right of appeal is compromised because the record is incomplete. Specifically, he complains about the trial court's failure to record a bench conference which occurred during his testimony and which dealt with the relevance of state's exhibit number 59, documents pertaining to his divorce from Dawn Casey. Defendant is also complaining about the failure to record bench conferences relating to objections made during the rebuttal testimony of his ex-wife, Dawn Casey, pertaining to the introduction of the diary which she kept during their marriage. Defendant contends that during the unrecorded bench conferences, counsel objected to the testimony of Dawn Casey based on the fact that it contained privileged information as well as inadmissible other crimes evidence. He asserts that the failure to record these bench conferences may prohibit consideration on appeal of the merits of his assignments of error relating to this testimony.
Material omissions from the transcript of the proceedings at trial bearing on the merits of an appeal will require reversal. State v. Deruise, 98-0541 (La.4/3/01), 802 So.2d 1224, 1234, cert. denied, 534 U.S. 926, 122 S.Ct. 283, 151 L.Ed.2d 208 (2001); State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542, 586. On the other hand, inconsequential omissions or slight inaccuracies do not require reversal. An incomplete record may nonetheless be adequate for appellate review. Finally, a defendant is not entitled to relief in this situation absent a showing of prejudice based on the missing portions of the transcript. State v. Castleberry, 98-1388 (La.4/13/99), 758 So.2d 749, 773, cert. denied, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999).
In State v. Hoffman, 768 So.2d at 586-587, the Louisiana Supreme Court stated:
This court has never articulated a per se rule either requiring the recording of bench conferences or exempting them from the scope of La. Code Crim. Proc. Art. 843. Still, art. 843's description of "objections" and "arguments" will normally apply only to objections made in open court and the arguments of counsel in closing, because only these objections and arguments *503 rise to a level of materiality sufficient to invoke art. 843. Similarly, Art. I § 19's command to record "evidence" does not encompass bench conferences, at least not ones that do not satisfy the materiality requirements of La.Code Crim. Proc. art. 843. (Citations omitted).
In the present case, defendant has in no way been prejudiced by the failure to record the bench conferences. Defendant has raised assignments of error on appeal relating to the introduction of the divorce documents as well as the testimony of his ex-wife. This court, in the pertinent assignments of error which follow, will address those issues.
After filing his original pro se brief, defendant filed a document entitled "Supplemental Brief on Behalf of Craig Parent, Appellant, Pro-se." In it he complains that his right of appeal is prejudiced because the appeal record does not contain closing arguments of counsel, or an exchange in which the jury requested additional instructions from the judge. Without being specific, defendant argues that the missing portions of the transcript contain reversible error.
Defendant does not frame the document as a motion to supplement the record, although it appears his intention is to have the appeal record supplemented with the transcripts of closing arguments and additional jury instructions. Even if defendant's supplemental filing is considered to be a motion to supplement the record, he is not entitled to relief. The transcripts cited by defendant are unrelated to any of defendant's assignments of error. LSA-C.Cr.P. art. 914.1; State v. Williams, 00-0011 (La.App. 4 Cir. 5/9/01), 788 So.2d 515, 520, fn. 1, writ denied, 01-1813 (La.5/10/02), 815 So.2d 832.
Based on the foregoing discussion, we find no merit to the arguments raised by defendant in his first assignment of error.

ASSIGNMENT OF ERROR NUMBER TWO
In his second assigned error, defendant argues that the trial court erred in admitting state's exhibit number 59, in globo, documents pertaining to his divorce from Dawn Casey. He specifically asserts that this exhibit contained inadmissible "other crimes" evidence in the form of a diary kept by Ms. Casey. Defendant contends that this "other crimes" evidence was irrelevant to the charges at issue, and further that the state failed to provide proper notice of its intention to produce this evidence.
An examination of this exhibit shows that it contains a court judgment ordering that the parties to the divorce be evaluated by a psychiatrist and setting out visitation and child support schedules. It also contains an evaluation report by the court appointed psychiatrist. However, it does not, as defendant asserts, contain Ms. Casey's diary. The diary entries of which defendant complains were admitted as state's exhibit number 62A during Ms. Casey's rebuttal testimony. In a subsequent assignment of error,[5] we have addressed the issue of whether the trial court properly allowed the evidence relating to Ms. Casey's diary. Accordingly, this assigned error is without merit.

ASSIGNMENTS OF ERROR NUMBERS THREE AND FOUR
Defendant argues that the trial court erred in that it failed to advise state rebuttal witness Dawn Casey that she might take advantage of the spousal privilege, *504 and thereby decline to testify against him. Defendant further complains that the court erred in allowing Ms. Casey to testify at trial.
The Louisiana Code of Evidence provides for both confidentiality and testimonial privileges for married persons. LSA-C.E. arts. 504-505. These are two distinct privileges. With some limited exceptions, each spouse has a privilege during and after a marriage to refuse to disclose, and to prevent the other spouse from disclosing, confidential communications with the other spouse while they are husband and wife. LSA-C.E. art. 504B. A communication is considered "confidential" "if it is made privately and is not intended for further disclosure unless such disclosure is itself privileged." LSA-C.E. art. 504A. Additionally, witness spouse has a privilege, during the marriage, not to testify against the other spouse in a criminal case. LSA-C.E. art. 505. State v. Sarrio, 01-543 (La.App. 5 Cir. 11/27/01), 803 So.2d 212, 222.
A privilege may be waived if the person upon whom the privilege has been conferred voluntarily discloses any significant part of the privileged matter. LSA-C.E. art. 502A. If a spouse waives the right to testimonial privilege, the waiver gives the spouse the right to testify against the other spouse as to non-privileged evidence. State v. Taylor, 94-0696 (La.9/6/94), 642 So.2d 160, 164; State v. Bennett, 357 So.2d 1136, 1139-1140 (La. 1978); State v. Sarrio, supra.
In this case, the testimonial privilege did not apply to Ms. Casey, and thus, a waiver was unnecessary. LSA-C.E. art. 505 provides that "[t]his privilege terminates upon the annulment of the marriage, legal separation, or divorce of the spouses."
The privilege for confidential communications does apply even after the marriage is terminated, and may be invoked by either spouse. LSA-C.E. art. 504B. In the present case, however, the litany of threats and abuse about which Ms. Casey testified did not include anything that could reasonably be considered a confidential communication. Accordingly, these two assigned errors are likewise without merit.

ASSIGNMENTS OF ERROR NUMBERS FIVE, SIX, AND SEVEN
By these assignments, defendant argues the trial court erred in allowing the state to introduce improper rebuttal testimony by Dawn Casey, Mel Robarts and Keith Prejean. Defendant complains that Ms. Casey's testimony constituted inadmissible "other crimes" evidence, that the testimony adduced from Robarts was not relevant to the charges against him, and that the state improperly held Prejean's testimony for rebuttal when it should have presented it in its case in chief. Defendant further argues that the testimony of these witnesses exceeded the scope of proper rebuttal evidence.
LSA-C.E. art. 611E provides, "The plaintiff in a civil case and the state in a criminal prosecution shall have the right to rebut evidence adduced by their opponents." Rebuttal evidence is that which is offered to explain, repel, counteract or disprove facts given in evidence by the adverse party. State v. Tyler, 97-0338 (La.9/9/98), 723 So.2d 939. The issue of what constitutes valid and admissible rebuttal evidence lies within the sound discretion of the trial court. State v. Huizar, 414 So.2d 741, 749 (La.1982). The trial court's determination will not be disturbed except in extreme cases, as where the evidence has been kept back deliberately *505 and for the purpose of deceiving and obtaining an undue advantage. State v. Amato, 96-0606 (La.App. 1 Cir. 6/30/97), 698 So.2d 972, 987, writs denied, 97-2626 (La.2/20/98), 709 So.2d 772 and 97-2644 (La.2/20/98), 709 So.2d 772.
In the present case, Ms. Casey, defendant's ex-wife, testified that she had kept a diary during 1991 and 1992 to maintain a record of defendant's physical and emotional mistreatment of her. Her diary entries (state's exhibit 62A) recounted how defendant had threatened to kill her and her family, to kidnap their son, to do harm to her divorce attorney and his family, and to burn down her parents' business. She recorded instances in which defendant telephoned her repeatedly and harassed her at work. According to Ms. Casey, defendant routinely flew into fits of rage and caused damage to her house.
Although LSA-C.E. art. 404 provides that "other crimes" evidence is not generally admissible, evidence of "other crimes" may be used by the state in rebuttal if the defendant, through his own testimony, makes it relevant. State v. Banks, 307 So.2d 594, 599 (La.1975), State v. Tilley, 99-0569 (La.7/6/00), 767 So.2d 6, 23, cert. denied, 532 U.S. 959, 121 S.Ct. 1488, 149 L.Ed.2d 375 (2001). The notice requirements of State v. Prieur, 277 So.2d 126 (La.1973) do not apply to "other crimes" evidence offered on rebuttal. State v. Silguero, 608 So.2d 627, 630 (La. 1992).
At trial, defendant stated that he did not threaten Ms. Lambert, nor did he make harassing telephone calls. He also testified that he has never threatened to kill anyone. He said he never punched the walls of the house while he was married to Ms. Casey in order to intimidate her. Defendant denied having threatened to kill Ms. Casey, her family, or her lawyer. He said he did not threaten to burn down the business owned by Ms. Casey's family. This testimony by defendant raised issues which the state was entitled to rebut through Ms. Casey's testimony. Therefore, we find that the trial judge did not err in allowing this rebuttal evidence.
Defendant also complains about the rebuttal testimony of Mel Robarts. Mr. Roberts testified that he hired defendant to construct his family's home. Although defendant drew more than $60,000 from Mr. Robarts' building account, he failed to make the proper disbursements to subcontractors. After defendant declared bankruptcy, Mr. Robarts fought the discharge of that debt in bankruptcy court, and was awarded $66,000 in 1997. Thereafter, defendant made harassing telephone calls, telling Mr. Robarts, "You need to watch what you say to me. You don't want to make me mad. You know, you've got a lot to lose on Martin Street." Defendant implied to Mr. Robarts that he might harm his children. Mr. Robarts recounted an altercation he and defendant had in the Jefferson Parish courthouse in 1996.
Defendant argues that Mr. Robarts' testimony was not valid as rebuttal evidence because it did not contradict any of his own testimony. We find no merit to this argument. Mr. Robarts' testimony was relevant to refute defendant's testimony that he did not tell Mr. Robarts "You have a family. You don't want to get stupid." Defendant also testified that he did not recall an altercation with Mr. Robarts in the courthouse.
Defendant also complains about Mr. Prejean's testimony which had to do with defendant's offer to pay him to kill Ms. Lambert. Defendant complains that the state improperly reserved Prejean's testimony for rebuttal when it should have been part of the case-in-chief. Defendant further argues that Prejean's testimony *506 was not relevant to rebut any evidence produced by the defense.
The state may not forego use of "other crimes" evidence in its case-in-chief simply to circumvent Prieur requirements. State v. Silguero, supra. The record does not reveal that the state withheld Mr. Prejean's testimony in order to avoid notice requirements. Moreover, Prejean's testimony served to rebut defendant's testimony that he would never offer someone money to kill someone.
Based on the foregoing discussion, we find that the trial judge did not err in allowing the rebuttal testimony of these witnesses. These assigned errors are likewise without merit.

ASSIGNMENT OF ERROR NUMBER EIGHT
By this assignment, defendant argues he was prejudiced by the trial court's denial of his motion to sever offenses for trial. He asserts that the state's purpose in trying all seven counts in the same proceeding was simply to confuse the jury and to portray him as a bad person.
LSA-C.Cr.P. art. 495.1 provides:
If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires.
In State v. Deruise, 98-0541 (La.4/3/01), 802 So.2d 1224, 1232, the Louisiana Supreme Court discussed the considerations a trial court must take into account in determining whether to grant a severance:
A motion to sever is addressed to the sound discretion of the trial court, and the court's ruling should not be disturbed on appeal absent a showing of an abuse of discretion. Brooks, 541 So.2d at 804 (citing State v. Williams, 418 So.2d 562, 564 (La.1982)). In ruling on such a motion, the trial court must weigh the possibility of prejudice to the defendant against the important considerations of economical and expedient use of judicial resources. In determining whether joinder will be prejudicial, the court should consider the following: (1) whether the jury would be confused by the various counts; (2) whether the jury would be able to segregate the various charges and evidence; (3) whether the defendant would be confounded in presenting his various defenses; (4) whether the crimes charged would be used by the jury to infer a criminal disposition; and (5) whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile. Id. (quoting State v. Washington, 386 So.2d 1368, 1371 (La.1980)). However, the fact that evidence of one of the charges would not be admissible under State v. Prieur, 277 So.2d 126 (La.1973), in a separate trial on the joined offense, does not per se prevent the joinder and single trial of both crimes, if the joinder is otherwise permissible. State v. Davis, 92-1623, p. 9 (La.5/23/94), 637 So.2d 1012, 1019 (citing State v. Celestine, 452 So.2d 676 ([La.]1984)). Finally, there is no prejudicial effect from joinder of two offenses when the evidence of each is relatively simple and distinct, so that the jury can easily keep the evidence of each offense separate in its deliberations. Brooks, 541 So.2d at 805.
In the present case, the state presented its case chronologically, and in such a manner as to keep the evidence pertaining to each count relatively simple and *507 distinct. The trial court charged the jury separately as to each offense, explaining in detail what the state was required to prove with respect to each count. Thus, we find it unlikely that the jury was confused by the various counts.
In this assignment, defendant asserts that the three charges of intimidating a witness should have been tried together, and that the extortion count should have been tried separately. However, the seven charges were all part of the same course of conduct. Even if the trial court had allowed severance of the counts in the manner in which defendant suggests, evidence of the burglary, unauthorized entry, and unauthorized use of a motor vehicle would have been admissible as integral parts of the charges of extortion and intimidating a witness. State v. Charles, 00-1586 (La.App. 5 Cir. 6/27/01), 790 So.2d 705, 708.
Based on the foregoing discussion, we find no error in the trial court's denial of defendant's motion to sever the offenses. This assigned error is without merit.

ASSIGNMENTS OF ERROR NUMBERS NINE AND TEN
By these two assignments, defendant complains that the trial court erred in allowing the state to amend its original bill of information to add two additional felony counts, in the absence of defense counsel. Defendant argues that his right to counsel was further violated when the trial court arraigned him on these two additional counts in the absence of counsel.
At that time, Frazilia Wiggins was defendant's counsel of record. She made an appearance at the beginning of that day's proceedings, at which time the parties discussed the amendments to the bill. The record reflects that the court then took up other matters. Later that day, when defendant's case was called for arraignment, attorney Archie Creech informed the court he would be standing in for Ms. Wiggins. Defendant objected to Mr. Creech's representation, stating that Creech was a friend of the victim in the instant case. The trial judge responded, "Then I cannot permit him to stand in for purposes of this arraignment." The judge did not appoint another attorney, but proceeded with the arraignment. The judge then informed defendant of the additional charges against him, and asked whether he wished to enter a plea of not guilty as to those counts. Defendant responded that he did.
An accused has a constitutional right to the assistance of counsel at every stage of criminal proceedings. LSA-Const. art. I, § 13; State v. White, 325 So.2d 584, 585 (La.1976). Furthermore, the constitutional right to assistance of counsel provided by the Sixth Amendment to the United States Constitution mandates the right, unless waived, to the assistance of counsel at every stage of the proceedings. Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967).
In the present case, the trial court's failure to appoint another attorney to represent defendant at his arraignment on the amended bill does not constitute reversible error. Defense counsel was present when the amendments to the bill were discussed. Furthermore, the court fully apprised defendant of the additional charges against him, and defendant pled not guilty. Defendant does not claim that he failed to understand the amended charges, or that the court adversely affected his defense by entering a not guilty plea on his behalf.
We further note that on February 12, 2001, the state amended the bill of information a second time, to add a seventh count. Ms. Wiggins was present at that *508 time, and defendant was arraigned as to the new count. He might have asked the court, through Ms. Wiggins, to arraign him again as to the counts added on November 21, 2000, but he did not do so. Nor did Ms. Wiggins object to the November 21 arraignment.[6] Defendant does not show how he was prejudiced by the trial court's actions. Accordingly, these assignments of error are without merit.

ASSIGNMENT OF ERROR NUMBER ELEVEN
By this assignment, defendant challenges the sufficiency of the evidence used to convict him of the three counts of intimidating a witness (counts 1,4, and 7), and the single count of extortion (count 6).
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Juluke, 98-0341 (La.1/8/99), 725 So.2d 1291; State v. Williams, 99-223 (La.App. 5 Cir. 6/30/99), 742 So.2d 604.
With regards to intimidation of witnesses, LSA-R.S. 14:129.1 provides, in pertinent part, as follows:
No person shall intentionally:
(a) Intimidate or impede, by threat of force or force, or attempt to intimidate or impede, by threat of force or force, a witness with intent to influence his testimony, his reporting of criminal conduct or his appearance at a judicial proceeding;
Defendant argues that the threats he was alleged to have made against Ms. Lambert during telephone conversations on November 10, 1999, February 19-20, 2000, and April 2-3, 2000, do not fall under the provisions of LSA-R.S. 14:129.1, since his actions did not ultimately prevent Ms. Lambert from bringing charges against him and pursuing them in court. Defendant's argument is misplaced. First, paragraph (a) of the statute explicitly encompasses attempts to impede a witness from reporting criminal conduct, even if they are unsuccessful. Moreover, the evidence was sufficient to show defendant had the specific intent to intimidate Ms. Lambert, and that Ms. Lambert felt threatened by his actions.
Defendant's pattern of threatening behavior towards Ms. Lambert began at least as early as November 2, 1999, and escalated from there. On November 10, 1999, defendant repeatedly telephoned Ms. Lambert at her mother's house. He alternately threatened to slit her throat, burn down her house, drown her, and kill her son. In his report regarding those incidents, Captain Blanco wrote, in part, "Mrs. Lambert stated that she believes that if she does anything to get Mr. Parent in trouble, that Mr. Parent would attempt to either kill her or do serious bodily harm to her." In a written interview attached to the officer's report, Ms. Lambert is quoted as saying, "I do believe that if [illegible] get [Craig Parent] in trouble, he will try and kill me."
On February 19-20, 2000, defendant arrived at Ms. Lambert's house in the middle *509 of the night. When she would not let him inside, he beat on the door with his hands and feet. He screamed at Ms. Lambert, demanding that she let him into the house. Ms. Lambert was frightened for her safety. She was certain defendant would kill her and her houseguest, Darlene Bennett. When Ms. Lambert's neighbor, Mr. Lanaux, offered to call police, Ms. Lambert begged him not to do so.
Ms. Lambert, fearing defendant would break the lock on her door, opened it with the intention of allowing him inside. She believed she could calm him if she talked to him. Defendant flew into a rage and pushed her against a kitchen counter. He beat on the kitchen cabinets and the refrigerator until his hands were bloody. He told Ms. Lambert he would kill her. Ms. Lambert testified that she knew she was going to die.
Ms. Bennett called police, and when an officer arrived, defendant began to call on the telephone and threaten Ms. Lambert. He said he would slit her throat. Ms. Lambert testified that she refused to press charges against defendant that night. Sergeant Brady Buckley attempted to take a statement from Ms. Lambert, but she was uncooperative. She was extremely upset, and told him she was afraid. Ms. Lambert testified that on March 28, 2000, she relented, and told police she wished to pursue criminal charges against defendant for his actions on February 19-20. At that point she felt it was the only way to keep herself and her child alive.
On April 2-3, 2000, defendant telephoned the home of Josephine Blanco, Ms. Lambert's mother, repeatedly. He said, "You know you think you're scared now. You don't know what scared is." Defendant said he was coming after Ms. Lambert. Ms. Blanco testified that both she and Ms. Lambert were terrified. Tommy Huff, who associated with defendant in prison, testified that defendant told him he had routinely made threatening calls to Ms. Lambert from his cellular telephone when he was intoxicated. Defendant also told Huff he called Ms. Lambert's mother and said, "If she tries to take me away from my kid, I'll kill her."[7] Huff and Keith Prejean both testified that defendant offered to pay them to kill Ms. Lambert.
The content of the threats defendant made against Ms. Lambert and her family and friends, together with his apparent attempts to have Ms. Lambert killed, are sufficient to show specific intent to intimidate her and induce her not to pursue criminal charges against him. Ms. Lambert's testimony, along with the testimony of those who witnessed her behavior, show that she felt threatened and intimidated by defendant's actions. Accordingly, we find that the state produced sufficient evidence to support defendant's three convictions of intimidating a witness. See State v. Mayeaux, 570 So.2d 185 (La.App. 5 Cir.1990), writ denied, 575 So.2d 386 (La.1991), in which defendant was convicted of intimidating a witness under facts similar to those herein.
Defendant also challenges the sufficiency of the evidence used to convict him of extortion. That offense in defined in LSA-R.S. 14:66, in pertinent part, as follows:
Extortion is the communication of threats to another with the intention thereby to obtain anything of value or any acquittance, advantage, or immunity of any description. The following *510 kinds of threats shall constitute extortion:
(1) A threat to do any unlawful injury to the person or property of the individual threatened or of any member of his family or of any other person held dear to him.
Defendant argues the state failed to prove extortion because 1) the evidence showed he simply called Ms. Lambert to ask her to repay a $7,000 loan he had made to her; and 2) because he did not receive anything of value as a result of any communicated threats. Again, defendant's argument lacks merit. The extortion statute proscribes the communication of a threat with the intent to obtain some advantage or something of value, regardless of whether the accused ever obtained the thing he sought. It is therefore irrelevant to a review of sufficiency whether the evidence showed Ms. Lambert owed defendant money, or whether the state proved defendant obtained the money. The pertinent questions are whether the state proved the communication of threats and defendant's specific intent.
Ms. Lambert testified that defendant called her on March 18, 2000, and threatened to break her legs and harm other members of her family if he did not give her what money she had. Ms. Lambert reported to Officer Troy Rigby of the Harahan Police Department that defendant had called her 10 times that day demanding money. Defendant threatened that if she did not give him what he wanted, he was coming to get her. From the testimony regarding defendant's communications with Ms. Lambert, it can be inferred that he had the specific intent to obtain money by threatening her. Accordingly, we find that state sufficiently proved the elements of the offense as provided in the statute. This assignment of error challenging the sufficiency of the evidence is without merit.

ASSIGNMENT OF ERROR NUMBER TWELVE
Defendant argues that the sentences imposed, each one the maximum allowed by law, and each one designated to run consecutively to the others, are excessive.[8] As evidenced by the following discussion, we find that the record clearly supports the sentences which were imposed by the trial judge.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. State v. Lobato, 603 So.2d 739, 751 (La.1992); State v. Munoz, 575 So.2d 848, 851 (La.App. 5 Cir.1991), writ denied, 577 So.2d 1009 (La.1991). Maximum sentences are reserved for the worst offenders. State v. Lefeure, 00-1142 (La.App. 5 Cir. 1/30/01), 778 So.2d 744, 755. The trial judge is given wide discretion in determining a sentence, and if the record supports the sentence imposed, the court of appeal will not set aside a sentence for excessiveness. LSA-C.Cr.P. art. 881.4D; State v. Esteen, 01-879 (La.App. 5 Cir. 5/15/02), 821 So.2d 60, 76.
If a defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, LSA-C.Cr.P. art. 883 provides that "the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be *511 served consecutively." LSA-C.Cr.P. art. 883. If the trial judge elects to impose consecutive sentences for crimes arising out of a single course of conduct, the trial court must articulate particular justification for such a sentence. State v. Johnson, 97-867 (La.App. 5 Cir. 4/15/98), 711 So.2d 848, 852, writ denied, 98-1293 (La.10/9/98), 726 So.2d 20.
The trial judge gave the following reasons when imposing sentence:
The court notes that the defendant has been convicted of seven felonies. The Court is of the opinion that there is an undue risk that if any sentence was suspended, that this defendant would commit additional crimes.
The Court is of the opinion that the defendant is in need of correctional treatment or a custodial environment that can be provided most effectively by his commitment to an institution under the supervision of the state of Louisiana.
Any lessor (sic) sentence which I will now impose in each one of these matters would depreciate the seriousness of the defendant's crimes.
The Court notes that the offender's conduct during the commission of these offenses manifested and delivered cruelty to the victim.
The Court further finds that the offender offered something of value in connection with the commission of one or more of these offenses.
Further, that the offender used threats of actual violence and did, in fact, commit violence upon the victim in this case.
The Court further notes that the offender committed at least two of the offenses in order to facilitate or conceal the commission of the other crimes.
The Court further notes the testimony offered during the course of this trial which supports that the defendant has, in fact, been involved in prior conduct, which has not been adjudicated.
The Court finds that the defendant is a danger to society and most particularly to this victim before this Court.
In the present case, the trial court sufficiently articulated reasons for imposing consecutive sentences. The judge was clearly concerned not only by defendant's extensive record of felony convictions, but by the crimes of violence recounted at trial for which defendant had not yet been prosecuted.[9] Also, a reading of the habitual offender bill of information shows that defendant was once charged with first degree murder in 1987, but was allowed to plead guilty to attempted armed robbery. The trial court's belief that defendant was a continuing threat to Ms. Lambert's safety is supported by the testimony at trial that defendant attempted to pay two men to kill her.
Further, we find that the record supports the maximum sentences imposed by the trial court. Defendant engaged in a relentless campaign to terrorize Ms. Lambert and put her in constant fear for her safety for months. Even after his initial arrest, he continued his constant threats against the victim and her family. The record shows that defendant's behavior towards Ms. Lambert was consistent with a long-time pattern of violent behavior. Based on the foregoing, we find that the trial court did not abuse its sentencing *512 discretion. This assigned error lacks merit.

ERRORS PATENT DISCUSSION
We have also reviewed the record for errors patent and have found none. LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990).
For the reasons set forth herein, defendant's convictions and sentences are hereby affirmed.
AFFIRMED.
NOTES
[1] The original bill of information charged defendant with four counts. The state then amended the bill of information to join a pending two count bill (district court case number 00-5104). The state again amended the bill to add another charge, for a total of seven counts.
[2] Pursuant to a motion to correct illegal sentence filed by the state, the trial court resentenced defendant on count 6, as a multiple offender, to life imprisonment at hard labor without benefit of parole, probation, or suspension. However, the appeal of this sentence is a separate matter and is not part of the instant appeal.
[3] Defendant testified that his cellular telephone number is 616-3554.
[4] Defendant later told police he had Ms. Lambert's permission to take the car.
[5] See discussion set forth in Assignments of Error Numbers 5, 6, and 7.
[6] LSA-C.Cr.P. art. 555 provides that "[a]ny irregularity in the arraignment, including a failure to read the indictment, is waived if the defendant pleads to the indictment without objecting thereto. A failure to arraign the defendant or the fact that he did not plead, is waived if the defendant enters upon the trial without objecting thereto, and it shall be considered as if he had pleaded not guilty."
[7] The reference is to defendant's son Garrett, the offspring of defendant's earlier marriage to Dawn Casey.
[8] Considering that defendant was resentenced as a habitual offender to life imprisonment, it is not necessary to address the excessiveness of his original thirty year enhanced sentence.
[9] A sentencing judge may consider not only convictions, but past criminal behavior which did not result in a conviction. State v. Anderson, 02-273, p. 7 (La.App. 5 Cir. 7/30/02), 824 So.2d 517, 522; State v. Gilbert, 00-1822, p. 5 (La.App. 5 Cir. 1/16/01), 788 So.2d 574, 577.