| ¡WALTER J. ROTHSCHILD, Judge.
On December 11, 2003, defendant, Dennis Davis, was charged by bill of information with one count of intimidating and impeding a witness by force or threats of force, in violation of LSA-R.S. 14:129.1. At arraignment on December 15, 2003, he entered a plea of not guilty. On March 24, 2004, the trial court held a sanity hearing *297 and found defendant competent to proceed to trial.
On May 18, 2004, a jury trial commenced, and the jury returned a verdict of guilty of intimidating, impeding or injuring a witness. Defendant was sentenced on May 26, 2004, to serve five years imprisonment at hard labor.[1] He filed a motion for appeal on May 28, 2004.

FACTS

Julia Herad met defendant in April 2002 at Casino Magic in Bay St. Louis, and the two began dating shortly thereafter. After about six weeks of dating, the | sdefendant became abusive towards her, so Julia ended their relationship. Defendant reacted to the break-up with anger and called her constantly. At times, defendant called her 90 to 100 times in a day.
Julia testified that on one occasion, defendant began cursing and threatening her as she was driving. Because of this behavior, she became afraid and once she arrived home, she locked herself inside of her house, leaving him outside. From this incident, the abusive behavior only accelerated.
According to Julia, another incident occurred when she went to defendant’s mother’s house to retrieve some property that defendant had stolen from her. When she tried to leave, defendant took her car keys from her and refused to give them back. Julia testified that he twisted her hand and broke her finger.
Julia testified that on another occasion, defendant shoved his way into her house and refused to leave for eight hours. When Julia tried to run to the front door to escape, a physical encounter ensued, causing her to fall and hurt her head. Also, while she was sitting in a chair, defendant tried to grab her out of it. She began to kick, so he slapped her in her face and threw her on the floor, putting his hands around her throat while he was on top of her. She believed that she was going to die. Julia went to the hospital after hurting her head, but she did not tell the doctor what had happened to her, because defendant showed up at the hospital and she was afraid of him.
Julia testified that another incident happened when she went to Casino Magic in Biloxi with her sister and brother-in-law. When she and her sister were walking around the casino, defendant suddenly appeared in front of them and handed her an envelope stating, “This is for you.” The envelope contained two photographs taken of her by Casino Magic at a concert. Later, defendant appeared again behind her with his arms folded, glaring at her as she gambled. Although she did not alert the casino’s security personnel, Julia testified that she was terrified Land knew something was going to happen. Subsequently, Julia went to her hotel room and defendant followed her into her room, against her wishes. According to Julia, defendant sat her down and screamed obscenities at her. He told her that she was no good and that he was going to hurt her if she did not start seeing him again and if she did not let him keep her car. Julia testified that he threatened her physically and that she was terrified during this six hour encounter.
On the following day, Julia was at home when someone started banging on her front door. Although she did not answer the door and the pounding stopped, the doorbell began ringing and the pounding *298 on the door started again five minutes later. Julia testified that she pressed the panic button on her alarm system. Then, she looked out of a window and noticed defendant driving away. Once the police arrived, Julia opened the door and found a dozen yellow roses at her doorstep. Julia filed a police report with the St. Tammany Parish Sheriffs Office.
According to Julia, on October 17, 2003, she received hundreds of calls from defendant. Detective Mike Dauth of the St. Tammany Parish Sheriffs Office interviewed her this same day. While Detective Dauth was at her residence, defendant called Julia and he listened to the conversation on the other line. Detective Dauth testified that in this conversation he heard the following:
He told her that he had seen her at Casino Magic in Bay St. Louis, and observed her going down on a Security Guard. He said that she would have to pay for someone to get her car back. He had her automobile. That she would have to pay for somebody to get her car back. When she got it back, that the fan belt would be cut and that the tires would be removed from the vehicle, because he had paid for those items on the vehicle.
Detective Dauth further testified that defendant said he knew who she was sleeping with and talking to, because he had gone into her mailbox and removed her cell phone bill. Detective Dauth also stated that when defendant called back, he spoke to him, identified himself, explained the investigation, and asked him to |scome to his office to discuss the matter and to return Julia’s vehicle. Defendant responded, “F.U., F.U. A-hole” and accused him of sleeping with Julia. Defendant further claimed that he had videotapes of both him and the deputy that took the report from her the previous night sleeping with Julia. Defendant threatened to contact internal affairs to inform them that Detective Dauth was sleeping with the victim. Detective Dauth testified that defendant called back minutes later, and he told defendant that he would be happy to discuss the situation with him at his office. According to Detective Dauth, defendant again directed vulgar language at him and threatened him by stating, “You’ll find out whose [sic] going to be in trouble.”
Julia obtained a temporary restraining order and a protective order against defendant. Defendant was arrested and issued an order by the court, requiring him to stay away from Julia. However, Julia testified that defendant continued to contact her at her home. He called her several times, telling her that she should drop the charges, because he would get her if he was hurt. She believed this meant that he would kill her. Detective Dauth testified that after Julia called and said that he was still calling her, a warrant was issued for defendant’s arrest for stalking, unauthorized use of a motor vehicle, peeping tom, telephone harassment and theft. He further testified that he listened to messages that defendant left on Julia’s voicemail. Defendant was arrested at his mother’s residence after calling Julia on October 24, 2003.
On October 29, 2003, defendant called Julia on her cell phone while she was working at Haynes Middle School and told her that he was going to make her sorry if she did not drop the charges against him. Julia contacted the police. Defendant called again when Jefferson Parish Deputy Steven Trapani was present and able to listen to the conversation. During this phone call, defendant again told her that if |fishe did not drop the charges, she would *299 be sorry and he was going to get her.[2] Julia testified that she was fearful after receiving these two phone calls and that she believed defendant had the ability to carry out his threats because of his past actions. According to Deputy Trapani, a warrant was then issued for defendant’s arrest in Jefferson Parish.
Defendant’s brother, Robert Davis (“Rusty”), testified that Julia was with defendant the Monday and Tuesday before he was arrested; however, Julia denied this.

DISCUSSION

In his first assignment of error, defendant contends that the trial court improperly admitted “other crimes” evidence during trial. Defendant argues that the court’s ruling that the details involving alleged other crimes was “part and partial [sic] of the offense,” categorizing these details as “res gestae” evidence, warrants a reversal of his conviction. Defendant further contends that the admission of explicit details of pending charges in St. Tammany, as well as conduct for which he never was charged, was unfairly prejudicial.
The State responds that the evidence was properly admitted at trial since it was integral to the charged conduct. In addition, the State responds that the evidence would also be admissible because it tended to prove a material issue and had independent relevance other than to depict defendant as a bad person.
Evidence of other crimes or bad acts committed by a criminal defendant is generally not admissible at trial. LSA-C.E. art. 404 B(l); State v. Prieur, 277 So.2d 126, 128 (La.1973). However, such evidence may be admitted by certain statutory and jurisprudential exceptions to the exclusionary rule when it tends to prove a 17material issue and has independent relevance other than showing that the defendant is of bad character. State v. Dauzart, 02-1187 (La.App. 5 Cir. 3/25/03), 844 So.2d 159, 165. LSA-C.E. art. 404(B)(1) provides that,
[ejxcept as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. .It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
Certain requirements must be met for other crimes evidence to be admitted. One of the factors enumerated in LSA-C.E. art. 404(B)(1) must be at issue, have some independent relevance, or be an element of the crime charged. State v. Jackson, 93-0424 (La.10/18/93), 625 So.2d 146, 149. Further, the probative value of the *300 extraneous evidence must outweigh its prejudicial effect. LSA-C.E. art. 403.
The defendant bears the burden to show that he was prejudiced by the admission of other crimes evidence. State v. Dauzart, supra at 165-166. Absent an abuse of discretion, a trial court’s ruling on the admissibility of evidence pursuant to LSA-C.E. art. 404(B)(1) will not be disturbed. State v. Merritt, 04-204 (La.App. 5 Cir. 6/29/04), 877 So.2d 1079, 1085, writ denied, 04-1849 (La.11/24/04), 888 So.2d 228.
Defendant was charged with intimidating and impeding a witness in violation of LSA-R.S. 14:129.1 which provides, in pertinent part, that no person shall intentionally:
(a) Intimidate or impede, by threat of force or force, or attempt to intimidate or impede, by threat of force or force, a witness with intent to influence his testimony, his reporting of criminal conduct or his appearance at a judicial proceeding;
|ROn May 18, 2004, just prior to the commencement of the jury trial, the trial court conducted a Prieur hearing. At the hearing, defendant argued that only a reference to the charges against defendant was necessary at trial and that the details leading up to these charges were prejudicial and should not be allowed. After finding that the evidence the State wanted to admit was not Prieur evidence but more properly was “part and partial [sic] of this offense,” the trial court ruled that the other crimes evidence could be presented to the jury. Defendant objected to this ruling.
 Evidence that constitutes an integral part of the crime, formerly known as “res gestae,” is admissible without any prior notice to the defense. State v. Charles, 00-1586 (La.App. 5 Cir. 6/27/01), 790 So.2d 705, 708. A close connexity is required between the charged and uncharged conduct to assure that the purpose served by admission of the other crimes evidence is to complete the story of the crime on trial by proving its immediate context of happenings near in time and place, rather than to depict the defendant as a bad man. Id. As recognized by this Court,
[t]he test for integral act (res gestae) evidence is, therefore, not simply whether the State might somehow structure its case to avoid any mention of the uncharged act or conduct, but whether doing so would deprive the State’s case of narrative momentum and cohesiveness, “ ‘with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.’ ”
State v. Rhea, 03-1273 (La.App. 5 Cir. 2/23/04), 868 So.2d 863, 867 (citing State v. Colomb, 98-2813 (La.10/1/99), 747 So.2d 1074, 1076, quoting Old Chief v. United States, 519 U.S. 172, 187, 117 S.Ct. 644, 653, 136 L.Ed.2d 574 (1997)).
In State v. Parent, 02-835 (La.App. 5 Cir. 12/30/02), 836 So.2d 494, 497, writ denied, 03-0491 (La.10/31/03), 857 So.2d 472, defendant was charged with unauthorized entry of an inhabited dwelling, unauthorized use of a motor vehicle, |flsimple burglary, extortion and three counts of intimidating a witness. Finding no error in the trial court’s denial of defendant’s motion to sever the offenses, this Court explained,
.... the seven charges were all part of the same course of conduct. Even if the trial court had allowed severance of the counts in the manner in which defendant suggests, evidence of the burglary, unauthorized entry, and unauthorized use of a motor vehicle would have been ad *301 missible as integral parts of the charges of extortion and intimidating a witness.
Id. at 507.
In State v. Brown, 95-124 (La.App. 5 Cir. 5/30/95), 656 So.2d 1070, 1071, the defendant was convicted of four counts of intimidating a witness. On appeal, the defendant argued that the trial court erred in admitting into evidence references to other alleged criminal activity which was not res gestae to the charged offense and was not otherwise properly admissible. Id. at 1074. Specifically, the trial court allowed into evidence references defendant made to his criminal record in letters sent to the victims who were witnesses in the extortion case. Id. This Court rejected the defendant’s contentions by providing,
[i]n the instant case the references were highly probative of the elements of “intimidate ... by threat of force” by showing that the defendant had the wherewithal to harm Ms. Stein and her family, as opposed to just making “idle threats.” Furthermore, the references were contained in letters to the victims which were introduced at trial and, as such, constituted evidence of prime significance regarding the proof of the offenses. Therefore, the references were more probative than prejudicial and were properly admitted as evidence of conduct that constituted an integral part of the offenses of intimidating witnesses.
Id. at 1075.
In the instant case, the references made at trial to other crimes and bad acts of defendant were more probative than prejudicial and were properly admitted as evidence of conduct that constituted an integral part of the offense of intimidating a witness. Further, the evidence would also be admissible because it tended to prove b^a material issue and had independent relevance other than to depict defendant as a bad person. The evidence was admissible to prove identity, specific intent, motive, and plan. Defense counsel made an issue as to the identity of the caller at trial. Accordingly, this assignment of error is without merit.
In his second assignment of error, defendant argues that his sentence is constitutionally excessive and should be vacated, because he received the maximum sentence of five years at hard labor[3] and the trial court did not provide reasons to justify this sentence for a first-time offender. The State responds that the record demonstrates that the sentence imposed was not excessive, and that the trial court is given wide discretion in determining a sentence.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive, even if it is within the statutory limits, if it is grossly disproportionate to the severity of the offense or imposes needless and purposeless pain and suffering. State v. Lobato, 603 So.2d 739, 751 (La.1992).
In reviewing a sentence for ex-cessiveness, the reviewing court must consider the crime and the punishment in light of the harm to society and gauge whether the penalty is so disproportionate as to shock its sense of justice, recognizing at the same time the wide discretion afforded the trial judge in determining and imposing the sentence. State v. Allen, 03-1205 (La.App. 5 Cir. 2/23/04), 868 So.2d 877, 879. In reviewing a trial court’s sentencing discretion, three factors are considered: 1) the nature of the crime, 2) the nature and background of the offender, *302 and 3) the sentence imposed for similar crimes by the same court and other courts. Id. at 880.
Generally, maximum sentences are reserved for cases involving the most serious violations of the offense charged and the worst type of offender. State v. Petty, 99-1307 (La.App. 5 Cir. 4/12/00), 759 So.2d 946, 950, writ denied, 00-1718 (La.3/16/01), 787 So.2d 301. However, the trial judge is afforded wide discretion in determining a sentence, and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed. State v. Uloho, 04-55 (La.App. 5 Cir. 5/26/04), 875 So.2d 918, 933, writ denied, 04-1640 (La.11/19/04), 888 So.2d 192.
According to LSA-R.S. 14:129.1, “[w]ho-ever violates the provisions of this Section shall be fined not more than five thousand dollars, imprisoned, with or without hard labor, for not more than five years, or both.” Defendant was sentenced to five years imprisonment at hard labor, to run consecutive to his six month sentence in case number 03-7652 for violating the protective order.
The trial judge did not state reasons for the sentence imposed upon defendant; however, the record reflects an adequate basis for the sentence. The trial court was aware of defendants background from the competency report filed during the pretrial proceeding. The court, likewise, was aware of the continuous threats posed to the victim based on defendants pattern of abusive behavior against her. Defendants prior conduct displayed a total disregard for the deterrent effect of police presence and for non-incarceration alternative measures, such as protective orders designed to protect the victim. Defendant engaged in a relentless campaign to terrorize Julia, putting her in constant fear for her safety, even after steps were taken to deter his violent pattern of behavior against her.
Considering all of the circumstances in this case, we find that the trial court did not abuse its discretion by imposing a sentence of five years imprisonment at hard labor. Accordingly, this assignment of error is without merit.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). No errors requiring corrective action were noted.
| VJDECREE
For the reasons set forth above, we affirm defendant’s conviction and sentence.

AFFIRMED.

. The trial court ordered this sentence to run consecutive to the six month. sentence imposed in case number 03-7652. Case number 03-7652 was heard by the trial judge simultaneously with the juty trial, and the trial judge found defendant guilty of violating a protective order, in violation of LSA-R.S. 14:79.

. Deputy Steven Trapani read his report regarding the conversation he heard: "I listened to the conversation between the victim and suspect. Basically the suspect requested to discuss current charges pending against him with victim One. Victim One refused to discuss anything with the suspect. Victim One stated that suspect telephone contact was a violation of the Court Order. Suspect One responded that he needed to speak with Victim One in person; and that if she contacted the Sheriff's Office to file a report he would retaliate by unknown means. Suspect stated: "If you pursue this any further you're going to have problems.”

. Although defendant argues that he received the maximum sentence, the sentence imposed was not the maximum sentence allowable by law because no fine was imposed.