902 So.2d 434 (2005)
STATE of Louisiana
v.
Derrick NELLON.
No. 04-KA-1253.
Court of Appeal of Louisiana, Fifth Circuit.
April 26, 2005.
*435 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Juliet Clark, Assistant District Attorneys, Gretna, LA, for Plaintiff/Appellee.
James A. Williams, Butch Wilson, Gretna, LA, for Defendant/Appellant.
Panel composed of Judges MARION F. EDWARDS, CLARENCE E. McMANUS, and WALTER J. ROTHSCHILD.
WALTER J. ROTHSCHILD, Judge.
On December 9, 1999, defendant, Derrick Nellon, along with co-defendant, Silas Antoine, was charged by bill of indictment with first degree murder, in violation of LSA-R.S. 14:30. Defendant pled not guilty to this charge on December 21, 1999. On June 1, 2000, the bill of indictment was amended to charge defendants with second degree murder, in violation of LSA-R.S. 14:30.1. Defendant pled not guilty to the amended charge and filed various pre-trial motions. On January 13, 2003, the co-defendants were severed for trial.
Defendant proceeded to trial on February 19, 2003, and on the following day, a jury found him guilty as charged of second degree murder. Thereafter, on April 14, 2003, defendant's motions for new trial and post verdict judgment of acquittal were denied, and he was sentenced to life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence. This appeal follows.

FACTS
On September 27, 1999, at approximately 2:00 p.m., Chris Duplessis was at Ellious "Al" Carmouche's apartment playing a PlayStation game in the living room when three men kicked the door down and stated, "Get on the floor. Get down." At the *436 time, Carmouche was in the bathroom and his one-year old baby was in the bedroom. According to Duplessis, two of the men had revolvers. Believing his life was in danger, Duplessis got down. The perpetrators were asking, "Where it's at; where the s* *t at?" Duplessis witnessed one of the perpetrators, whom he identified in court as defendant, kick in the bathroom door. Thereafter, Carmouche was dragged into the living room and thrown on the floor. He was asked, "Where it's at? Where it's at?" After Carmouche reached for something, Duplessis heard three shots and then observed the perpetrators run out of the apartment. Carmouche told Duplessis to call the police because he was hit, and Duplessis called 911. After being transported to the hospital, Carmouche died from the gunshot wound to his buttock which transected his femoral artery, causing him to bleed to death.
Martha Barnett testified that she was in the parking lot of her apartment complex on the day of the incident, leaving to go to work in her security uniform. At the time, she was not carrying a weapon. While putting her belongings in the passenger side of her car, she heard three gunshots, and then observed three black males running from the direction of the gunshots toward her. She then went around to the driver's side to open her door and put the key in the ignition. However, she noticed that the men had slowed their pace, and she heard one of the men who was carrying a gun say, "the security guard." She then popped open her car's hood and pretended she did not see them. The three males got into a gray Toyota Corolla and pulled off. Martha Barnett was unable to identify the perpetrators.
In his first statement to the police, Duplessis lied and told them that the perpetrators were wearing rags and he could not identify them, because he was afraid for his life. However, the police conducted a follow-up interview and learned that Duplessis recognized two of the perpetrators as "Chuck," someone who had dated his sister, and "Dee," someone he knew from the neighborhood. Duplessis testified that defendant was the person he knew as Dee, and he was certain that he was one of the perpetrators.
Detective Donald Clogher of the Jefferson Parish Sheriff's Office testified that he investigated this shooting at the West Chase Apartment Complex and noted that the front door, which opened into the living room, was forced open and the bathroom door was forced from its hinges. He found a casing in the living room, one projectile in the wall and one projectile outside of the apartment. According to Detective Clogher, no readable fingerprints were found, and no weapons were located. Detective Clogher stated that the manner of the homicide and the evidence suggested the shooting may have been drug-related.
Although Duplessis told police he could recognize two of the perpetrators and knew their nicknames, i.e. Chuck and Dee, he looked at over a thousand photographs and could not identify anyone. However, the identities of the perpetrators were developed after Detective Clogher interviewed Steven Roy in connection with an unrelated armed robbery. Thereafter, a photographic line-up was created, and defendant and Antoine were identified by Duplessis. As a result, defendant and Antoine were arrested. The third perpetrator, however, has not been identified. Defendant was advised of his rights and gave several taped statements in which he denied participating in the victim's murder and indicated that he had an alibi at the time. In defendant's second statement, he identified the victim and Antoine *437 in photographs, stating that the victim was someone he saw once coming to the house to see his sister-in-law and Antoine was someone he called "Chuck." He stated that he saw Antoine at Lolitha Loeb's apartment on the day of the shooting. He stated that Antoine had come to "holler" at him for three or four minutes at around "one something, two o'clock," and then left. However, he believed Antoine was at the apartment earlier that morning while he was sleeping.
Silas Antoine identified defendant in court and denied that he had ever met the victim. He also denied "really knowing" Steven Roy who was charged in the armed robbery case for which Antoine was serving a sixty-year sentence in Angola. He denied telling Roy about wanting to rip off a guy for some drugs on Manhattan, denied having discussions with Roy after the victim was killed, and denied having anything to do with committing this murder or telling anyone that he did. He asserted that he knew Duplessis by face and nickname as someone from the area where he used to hang out. He testified that he was not with defendant on the day of the shooting.
Arthrel White, a defense witness who was in jail pending charges, testified that on the date of the shooting, she was dating the victim. She also stated that she was living with her sister, Lolitha Loeb, in Lolitha's apartment, along with her mother Peggy Johnson, Renette Ingraham and defendant, who was her sister's boyfriend. She testified that she knows Duplessis and his sister Monica. She further stated that Monica was dating Antoine, and that they had a baby together; however, Monica was "messing with" the victim, too.
According to White, defendant was on heroin and was sick on the date of the shooting. She stated that defendant never left the house that day and that the only time she left the house was to go get candy for him. When she returned from the store, defendant was still in bed wearing his pajamas. She testified that Antoine came to the house, and her sister introduced him to another man named Derrick, who was known as "Baby Gangster," and they drove off together with another individual named "Nook."
The victim's brother, Jimmy Carmouche, testified that he had a conversation with Arthrel White a couple of months earlier, and she told him she knew that Derrick, her sister's boyfriend, had murdered his brother. White denied this, and instead claimed she told him that the other Derrick, "Baby Gangster," did it. Jimmy Carmouche also denied that his brother dated White or Monica.
Renette Ingraham also testified that defendant was sick on the date of the shooting, trying to kick a heroin addiction. She further stated that he did not leave the house that day and that the only time she left was to go to the store to get candy for him. In her testimony, she stated that White had been in and out that day.
Captain Louise Walzer, an expert in firearms examination and ballistics analysis, examined evidence received in connection with this matter. Among the evidence examined were a 9-millimeter caliber fired cartridge case, one unknown caliber copper jacketed projectile, and one unknown caliber lead-like projectile. She testified that the copper jacketed bullet and the lead bullet could not have been fired from the same weapon; that is, the lead bullet was likely fired from a revolver, while the copper jacketed bullet was more consistent with a semi-automatic and the 9-millimeter case was more consistent with a 9-millimeter semi-automatic pistol. Dr. Susan Garcia, an expert in forensic pathology, performed an autopsy on the *438 victim and determined that he had received a single gunshot wound to his right buttock which exited from his thigh and resulted in total separation of his femoral artery. She determined that at the time the weapon was discharged, the shooter was behind or to the side of the victim, which is consistent with the victim lying on the ground in a prone position. She also concluded that the gun was discharged at an angle to the body due to an eccentric abrasion found on the victim. Dr. Garcia testified that the victim had cocaine and marijuana metabolite in his urine.

DISCUSSION
In his first assignment of error, defendant argues that the prosecutor violated the Confrontation Clause of the Sixth Amendment by calling a witness he knew would refuse to testify. He asserts that he was unfairly prejudiced when the State called Steven Roy to the stand, knowing that he would refuse to testify. The State responds that defendant failed to object when Steven Roy was called as a witness and, therefore, defendant has waived his right to appellate review of this issue. The State adds that this assignment of error is without merit because Roy did not assert a privilege.
In its opening statement, the State indicated that it would call Steven Roy to testify and that he was serving a lengthy prison sentence for an armed robbery conviction. The State asserted that Roy did not have a deal with the State and thus, the State could not vouch for what he would say or indicate whether or not he would speak to the jury at all. The State added that Roy would be called, however, because he is part of the case as to "how you get from A to Z." After these remarks, defense counsel asked for a mistrial. The State responded that the objection was premature and that even assuming Roy did not testify during trial, the information would still be presented to the jury to demonstrate how the defendant and Antoine were ultimately identified when Duplessis only knew nicknames. The trial court overruled defendant's objection and denied the motion for mistrial.
Although Roy was called as a witness by the State, he refused to testify. He did not assert any privilege; he simply refused to be sworn in and said nothing. The court threatened him with contempt of court, but withheld its decision with regard to contempt pursuant to the State's request. The only question posed to Roy by the State was: "Sir, did we have a discussion earlier today wherein you told me you would refuse to testify?" Thereafter, the judge asked defense counsel if he wanted to ask any questions, and he replied that he did not.
As noted by the State, the defendant did not contemporaneously object when Roy was called as a witness or at any time during the brief examination that took place. According to LSA-C.Cr.P. art. 841(A),
An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.
The purpose of the contemporaneous objection rule is to give the trial judge notice of an alleged irregularity, giving the judge the opportunity to make the proper ruling and correct any alleged prejudice to the defendant. State v. Williams, 04-608 (La.App. 5 Cir. 11/30/04), 889 So.2d 1093, 1100. Therefore, a defendant is prevented from gambling for a favorable verdict and *439 later utilizing appellate review to correct errors that could have been corrected by the trial judge. Id.
Because he did not contemporaneously object when Roy was called by the State or at any time during questioning of Roy, we find that defendant has failed to preserve this issue for appellate review. Accordingly, this issue will not be reviewed by this Court.[1]
In his second assignment of error, defendant asserts that his due process rights were violated and he was denied a fair trial when the State introduced inculpatory evidence and improper references regarding Silas Antoine, which improperly inferred guilt upon defendant. In addition, defendant contends that the State sought testimony from Antoine that would "dirty him up" in an attempt to infer "guilt by association." The State responds that defendant has waived this issue for appellate review, because he failed to object at trial. The State further contends that under LSA-C.Cr.P. art. 609.1(C), it was permitted to attack Antoine's credibility, and that defendant was not prejudiced by this testimony.
Defendant argues that the State sought to convict defendant based on his association with individuals, such as Roy and Antoine, who have been convicted of armed robbery, are serving long sentences at horrible prisons, possess machine guns, run from the police and refuse to testify in order to help their "friend." At the time Antoine was called as a witness by the State, the defendant did not object. Likewise, the defendant did not object to any questions the State asked Antoine, including questions concerning his residence in Angola, his conviction for armed robbery and his sixty-year sentence. In addition, the defendant did not question him.
Because defendant did not contemporaneously object during Antoine's testimony, he has not preserved these issues for appellate review. See LSA-C.Cr.P. art. 841(A), supra. Accordingly, defendant's argument regarding this questioning is not properly before this Court on appeal.
Defendant also contends that the State elicited irrelevant and prejudicial facts when the prosecutor asked Detective Clogher if Antoine was compliant when he was arrested, and the detective answered that Antoine was not compliant and had attempted to run. However, defendant did not object to this questioning. Accordingly, defendant's argument is not properly before this Court, because he did not contemporaneously object and preserve the issue for appellate review.
Defendant further argues that the State's "guilt by association" intent became even more apparent during redirect of Detective Clogher when the prosecutor elicited prejudicial information from him regarding an AK-47 associated with Antoine. However, it is defense counsel who initially asked Detective Clogher on cross-examination if weapons were found, and the detective acknowledged that an AK-47 was found but was not of evidentiary value to this case. On re-direct examination by the State, Detective Clogher again indicated *440 that an AK-47 was found which related to Antoine, but was of no evidentiary value to the present case. The State began to ask Detective Clogher which case involved the AK-47 when defendant objected. This objection was overruled, and Detective Clogher stated that it was relevant to the unrelated armed robbery case involving Antoine.
Although defendant argues that the State sought to convict defendant by placing him in the company of individuals who possess machine guns, it is defense counsel's question that initiated the initial response regarding the AK-47. This response alone indicated that Antoine was in possession of an AK-47. Accordingly, we find that the State's questioning on redirect was not improper, and defendant was not denied a fair trial. Therefore, this assignment of error is without merit.

ERROR PATENT DISCUSSION
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La. App. 5 Cir.1990). The review revealed that there is one error that requires corrective action.
The trial court failed to properly inform defendant of the prescriptive period for filing post-conviction relief, pursuant to LSA-C.Cr.P. art. 930.8. The trial court advised defendant he had "two years from the date your sentence becomes final to request post-conviction relief." This Court has held that the failure to advise defendant that the prescriptive period runs from the time his conviction and sentence become final is incomplete. State v. Grant, 04-341 (La.App. 5 Cir. 10/26/04), 887 So.2d 596, 598 (emphasis as found in the original). Although the commitment indicates that the trial court informed defendant that the prescriptive period runs from the time his conviction and sentence become final, when there is a discrepancy between the minutes and the transcript, the transcript prevails. See State v. Lynch, 441 So.2d 732 (La.1983). Therefore, we remand the case and order the district court to properly inform defendant of the time from which prescription for post-conviction relief runs by sending written notice of such to defendant within ten days of the rendition of this opinion and to file written proof in the record that defendant received the notice. State v. Grant, supra.

DECREE
For the reasons set forth above, we affirm defendant's conviction and sentence. We remand the case and order the trial court to inform defendant of the proper prescriptive period for filing post-conviction relief by sending him written notice within ten days of the rendition of this opinion and to file written proof in the record that defendant received the notice.
AFFIRMED; REMANDED WITH INSTRUCTIONS.
NOTES
[1] We note that in this assignment, defendant also "calls this Court's attention" to Detective Clogher's testimony wherein he revealed the contents of Steven Roy's statements inculpating Antoine and defendant. He contends that his Sixth Amendment right to confrontation was violated, because Roy was not subject to cross-examination. However, our review of Detective Clogher's testimony indicates that the contents of Roy's statements were not elicited by the prosecutor; rather, Detective Clogher merely indicated that Derrick Nellon emerged as a suspect in this case after he interviewed Steven Roy. We find no violation of the confrontation clause in this instance.