917 So.2d 471 (2005)
STATE of Louisiana
v.
Jerome McGINNIS.
No. 04-KA-1286.
Court of Appeal of Louisiana, Fifth Circuit.
October 6, 2005.
*473 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Juliet Clark, Bobby Malbrough, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Ron A. Austin, Richard C. Bates, Austin & Associates, Harvey, Louisiana, for Defendant/Appellant.
Panel composed of Judges JAMES L. CANNELLA, CLARENCE E. McMANUS, JAMES C. GULOTTA, Pro Tempore.
*474 CLARENCE E. McMANUS, Judge.
On November 20, 2003, defendant, Jerome McGinnis, was indicted by a Jefferson Parish grand jury for aggravated rape in violation of LSA-R.S. 14:42. Defendant was arraigned on November 21, 2003 and pled not guilty. On March 17, 2004, the trial court found defendant competent to stand trial. The trial court denied defendant's motion to suppress DNA evidence on May 12, 2004. On May 20, 2004, the trial court also denied defendant's motion to suppress statement.
On June 28, 29, and 30, 2004, the case was tried before a 12-person jury which unanimously found defendant guilty as charged. The trial court denied defendant's motions for new trial and motions for post-verdict judgment of acquittal on August 19, 2004. On August 23, 2004, the trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The trial court also ordered the sentence to run concurrently with any other sentence defendant was presently serving. Defendant filed a motion for appeal that was granted.

FACTS
S.S.[1] testified that, on September 25, 2003, at 7:43 a.m., she arrived at Barataria Chiropractic Clinic where she was employed as the office manager, put down her coffee and purse, and went to the back to punch in. After she punched in, she saw defendant in the hallway. She explained that she had left the front door unlocked that day as she usually did, and that defendant walked in without her knowledge and asked to use the restroom, which she permitted him to do.
S.S. heard the bathroom door open seconds later and said to herself that nobody could use the restroom that quickly. S.S. went out and met defendant in the hallway by the bathroom door. When she did so, defendant grabbed her from behind in a "bear hug", held a three-pronged garden tool shaped like a fork against her neck, and said, "[i]f you say anything b..tch, I'm going to kill you." Defendant dragged S.S. to the back to an "adjustment room." Defendant told S.S. to take off her clothes, so she took off her pants.
Afterwards, the telephone rang and S.S. told defendant she needed to answer the telephone because it might be her boss. Defendant dragged her back to the front room, but by the time they got there the telephone had stopped ringing. S.S. believed defendant still had the garden tool in his hand at that time. After the telephone stopped ringing, defendant dragged her back to the "adjustment room." Defendant put his hands on her head, forced her head to his crotch, and made her perform oral sex on him. He then pushed her back onto a table in the room.
S.S. told defendant that she was wearing a tampon because she was menstruating. S.S. pulled out her tampon, and defendant penetrated her. S.S. explained that she did not fight defendant because she was afraid. However, she testified that she kept telling defendant, "[n]o, don't do this, stop." S.S. also tried to dissuade defendant by telling him she had endometriosis, a disease that forms in women. Defendant then told S.S. that he had some cousins who knew what he was doing, and that if she said anything, his cousins knew where her little girl went to school.
Defendant asked S.S. if she had a little girl and she said, "[y]es", even though she *475 did not. Afterwards, defendant told S.S. to look into his eyes and swear on her little girl's head that she was not going to tell anybody. S.S. did as she was told. Defendant got off of her, and she put on her pants. S.S. picked up the garden tool which was on the side of the "adjustment table" and walked out, and defendant walked behind her. Before defendant left, he asked S.S. if he could get her telephone number. S.S. answered affirmatively and told him to come back later and get it.
After defendant left, S.S. closed the door and locked it. She went to the bathroom and wiped herself and then called her boyfriend. S.S. only talked to her boyfriend briefly because she was not ready to tell him what happened. She dialed 911 several times but thought that the calls did not go through because she did not hear a dial tone. S.S. later learned that the 911 calls had gone through. While S.S. was on the telephone, she looked up and saw defendant standing at the window. Defendant knocked on the door underneath the carport and told her to open it because he needed to talk to her. She thought that defendant had come back to kill her, so she opened the front door (which was in the same room where defendant raped her) and ran to Shoney's next door. As she ran she called 911 again and spoke to someone.[2] She went inside Shoney's to the back and told the ladies that a man had attacked her. One of the cooks said, "[l]ook, they (sic) have a guy running across the street over there." Police officers then arrived. S.S. told them what happened and gave them a description of defendant. Within the hour, an officer took S.S. behind the clinic to the abandoned Schwegmann's where she positively identified defendant. Afterwards, S.S. went to Lakeside Hospital where she was examined by Dr. Wolfson. When the examination was complete, she spoke to Lt. Maggie Pernia and gave a statement to Officer Darren Monie.
S.S. testified that she recognized defendant because she had seen him in the clinic approximately one week prior. She explained that defendant worked at CiCi's Pizza across the street, that he had asked to use the telephone two or three times prior to September 25th, that she had given defendant a brief ride home in her vehicle on one occasion in the past week when it was raining because she was just being "nice", that defendant had brought her pizza the day after to thank her for her kindness, and that defendant told her he lived four houses down from the clinic. S.S. also testified that, on September 25th, and on the days that she had seen defendant previously, defendant wore black pants and a white t-shirt and a net on his head. She recalled that, on September 25th, defendant had his maroon Cici's Pizza t-shirt in his hands. S.S. remembered passing defendant on her way to work on the morning of the incident while she was driving her gray 1999 Mustang that she had had for three or four years.
JPSO Deputy Evan Ulmer testified that he responded to a call at Barataria Chiropractic Clinic. When he arrived, he found the front door ajar and observed a pair of women's panties by the front door. Deputy Ulmer entered the building, conducted a search, and found no one inside. At that time, officers received a call from S.S. who was next door at Shoney's. Deputy Ulmer went to Shoney's and interviewed S.S. who told him she had been raped at the clinic *476 next door and gave him a description of defendant as a black male wearing a white shirt and black pants. Deputy Ulmer returned S.S. to the scene and medical personnel came and examined her.
JPSO Deputy Oliver Silvey testified that he learned that the JPSO was looking for a black male wearing a red t-shirt and black pants. After Deputies Silvey and Guy began searching for defendant, they saw him walking across the parking lot of the old Schwegmann's on Lapalco Boulevard. When defendant spotted Deputy Silvey, he (defendant) ran. The deputies were driving back and forth trying to catch defendant. When they got close to him, Deputy Silvey exited the vehicle and ran after defendant. Deputy Silvey testified that when he finally apprehended defendant, defendant kept saying, "[o]h God, oh God, I didn't do anything, I didn't do anything", even though Deputy Silvey had not told defendant why he was being apprehended.
JPSO Detective David Spera testified that defendant led them to the garden tool, which was located by a closed, rundown Schwegmann's in the 5100 block of Lapalco. He testified that a Cici's hat was also located in that area.
JPSO Lt. Maggie Pernia, commander of the personal violence unit, testified that she took two statements from defendant on September 25, 2003. She testified that defendant initially denied going into the clinic that morning, but later admitted that he did so and that he and S.S. had sex. When she asked defendant if he had a weapon with him, he initially said he did not. She explained that during the second interview, defendant admitted he had a tool, said it was like a box cutter, described it as a "sharp thing" you eat with, and then drew a picture of a three-pronged fork. She testified that defendant told her he threw the box cutter away by Shoney's and denied taking the tool into the clinic with him. During the interview, defendant told Lt. Pernia he was going back to work after he had sex with S.S.; however, she noted that defendant walked in the opposite direction afterwards. Lt. Pernia thought defendant was lying because he kept changing his story.
Dr. Neil Wolfson, who was qualified as an expert in the field of obstetrics and gynecology, testified that he took a history from and examined S.S. on September 25, 2003. The history given by S.S. to Dr. Wolfson of the circumstances surrounding the rape was virtually identical to her trial testimony. Dr. Wolfson testified that S.S. was "extremely upset" when he saw her, but that she was trying to keep herself composed.
Dr. Wolfson collected specimens from S.S. and put them in a sexual assault kit which was given to a JPSO detective. Dr. Wolfson also gave S.S. medication to protect against sexually transmitted diseases, including gonorrhea, and to prevent pregnancy. He testified that he had interviewed thousands of patients, and that in his opinion, S.S. was "severely emotionally traumatized." He did not find any signs of physical trauma.
Bonnie Dubourg, who was qualified as an expert in DNA analysis, testified that she received a buccal swab (a scraping of the inside of the cheek) from S.S., a buccal swab from defendant, and a vaginal swab from S.S. Her report indicated that the DNA test results for the sperm cell fraction of the vaginal swab of S.S. were consistent with the buccal swab of defendant and, therefore, defendant was not excluded as the major DNA donor. The report further indicated that for the 13 markers tested, the genetic profile of the major DNA donor to the sperm cell fraction of S.S.'s vaginal swab occurred with a frequency of approximately one in ten billion random, unrelated individuals of the Caucasian, *477 African American, and Hispanic populations.
After the state rested its case, the defense called defendant as a witness. Defendant, age 21, testified that he stopped at the clinic on his way to work at Cici's Pizza. He explained that he found the garden tool by the house next to the clinic and that he picked it up and took it with him. He said there was "no odd reason" why he picked up the tool.
Defendant testified that he walked into the clinic and asked S.S. if he could use the restroom. She told him "[y]es", so he used the restroom, then came back out. When defendant saw S.S. coming down the hallway, he told her she looked pretty and that he liked her, which caused her to smile. Defendant testified that he and S.S. then went to the back room, that S.S. took off her shoes, that he unzipped his pants, and that she grabbed him and began performing oral sex.
Afterwards, defendant explained that S.S. got onto the table and that they had sex for 20 to 25 minutes. When S.S. told him that her other employee was on her way to work, defendant got up to leave. S.S. picked up the tool, gave it to him, and he left. S.S. locked the door behind him, which he found strange. Defendant went back to the clinic and knocked on the window. He wanted to tell S.S. that what they did was not right because she had a boyfriend and he had a girlfriend, but S.S. did not come to the door.
Afterwards, defendant threw the garden tool in the grass next to Shoney's, then went to Pizza Hut to see if his father was at work, but he was not. Defendant testified that he disposed of the tool for "no odd reason", but then testified that he had an attachment for a traffic ticket and did not want the police to catch him with a weapon. Defendant then started walking to his mother's house to get his mother's car. At some point, he saw police officers running after him so he ran because of his traffic ticket.
When the police officer told him to stop and get on the ground, he obeyed the officer. Defendant claimed that the officer told him he was being arrested for a traffic ticket, and that the officer said nothing about aggravated rape. The officers placed defendant in a police car and removed him when S.S. came to the scene. Defendant was then taken to the bureau where he gave a statement.
Defendant's testimony regarding his contact with S.S. prior to September 25th was very similar to that of S.S. Additionally, defendant testified that he did not rape S.S., that he did not ask her to perform oral sex on him, that he did not grab her from behind and put a tool to her neck, that he never threatened her with the tool, and that he did not say anything to the officer who arrested him. Defendant testified that he got confused when he was talking to Lt. Pernia about the box cutter. He explained that the box cutter was something he took to work, and that he never used the "tool fork" to open a box.
After the defense rested its case, the state called Dr. Susan Glade and S.S. as rebuttal witnesses in response to defendant's claim that the sex was consensual.
Dr. Glade, who was qualified as an expert in the field of psychiatry, testified that she saw S.S. on three occasions: March 23, 2004, May 4, 2004, and June 18, 2004. Dr. Glade testified that S.S. described being raped, that she complained of jumpiness, insomnia, and sweating, and that her symptoms started at the time of the incident and had progressively gotten worse. Dr. Glade explained that S.S. exhibited or reported being severely anxious, hyper-alert to her environment, afraid to go out by herself, and distrustful. Additionally, *478 S.S. told Dr. Glade that she isolated herself from much of the world, that she was withdrawing from people around her, and that she was having trouble functioning and focusing at school.
Dr. Glade diagnosed S.S. as having an adjustment disorder with anxiety and depression and symptoms of post-traumatic stress disorder. Dr. Glade believed that S.S.'s presentation of the incident and her ongoing treatment and course of progression of her symptoms were consistent such that it did not occur to Dr. Glade that S.S. was not being truthful. Dr. Glade prescribed an anti-depressant for S.S., and she testified that S.S. responded well to that.
It was Dr. Glade's understanding that S.S. had undergone extensive sessions of therapy at a rape crisis clinic. Dr. Glade testified that S.S. had responded to treatment, and that she anticipated having to continue to monitor and/or treat S.S. in the future. It was Dr. Glade's opinion that S.S. was not capable of being an aggressor in a rape situation, that S.S. was "quite naïve", that S.S. was vulnerable and placed herself in harm's way, and that was probably the reason this circumstance happened to S.S.
Dr. Glade thought that S.S. had flat, restricted feelings, that she was protecting herself from the underlying feelings she had about the rape, that if the underlying feelings surfaced they would be very painful, and that S.S. was not ready to experience the feelings at this time. Dr. Glade also noted that S.S. felt betrayed by her boss because he had allegedly altered the timesheet on the day of the rape to indicate that S.S. did not arrive until 9:00 a.m. or later to make it appear as if she had not been at work during the time of the rape.
S.S. testified in rebuttal that she sought counseling with "Melissa" at the YWCA a few days after the incident. S.S. explained that she then went to see "Consuelo" who developed a therapy plan for her, and that she saw "Consuelo" every week until the end of December. At that point, S.S. went to see "Nicole" at the rape center. S.S. testified that "Nicole" recommended that she see a medical doctor so she could obtain anti-depressant and anti-anxiety medication. Therefore, S.S. went to see Dr. Glade. S.S. explained that she saw Dr. Glade at the same time she was undergoing therapy at the rape center.
S.S. testified that the sex with defendant was not consensual and that she was not the aggressor. S.S. explained that she had lost interest in "things" since the rape, that she was not a full-time student anymore, that she was afraid to go out, that she did not "really leave her house" anymore, that she felt like everyone was going to attack her, that she did not make friends with people easily now, and that she was not as nice to people as she was before the rape. S.S. noted that defendant gave her gonorrhea, but that it cleared up shortly thereafter.

ANALYSIS
In his ninth allegation of error, defendant argues that the trial court erred when it denied his motion for new trial and motion for post-verdict judgment of acquittal, contending that the evidence was insufficient to support his conviction for aggravated raped. Defendant alleges that the evidence showed the sex was consensual. However, he alternatively claims that, if this Court finds that the evidence showed otherwise, the degree of force was so minimal that a verdict of attempted or forcible rape should have been returned. Defendant asserts that there was no evidence at trial that the victim resisted the act to the utmost but whose resistance was overcome by force, that the victim was prevented from resisting the act by threats of great and immediate bodily harm accompanied *479 by apparent power of execution, or that the victim was prevented from resisting the act because he was armed with a dangerous weapon during the commission of the act.
The state responds that the evidence was sufficient for a rational trier of fact to have found defendant guilty beyond a reasonable doubt of aggravated rape.
When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, such as the erroneous admission of evidence, the reviewing court should first determine the sufficiency of the evidence by considering all of the evidence, including evidence the trial court may have erroneously admitted. State v. Hearold, 603 So.2d 731, 734 (La.1992); State v. Mayeux, 94-105 (La.App. 5 Cir. 6/28/94), 639 So.2d 828, 834.
If the appellate court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. However, if the appellate court finds that the totality of the evidence was sufficient to support the defendant's conviction, it must then determine whether the trial court erred in admitting the questioned evidence and, if so, whether the trial court's error requires a reversal of the conviction or was harmless. State v. Alexis, 98-1145 (La.App. 5 Cir. 6/1/99), 738 So.2d 57, 64, writ denied, 99-1937 (La.10/13/00), 770 So.2d 339.
The question of sufficiency of evidence is properly raised in the trial court by a motion for post-verdict judgment of acquittal under LSA-C.Cr.P. art. 821. State v. Ellis, 95-1005 (La.App. 5 Cir. 3/26/96), 672 So.2d 1007, 1008 (citation omitted); State v. Gibbs, 03-967 (La.App. 5 Cir. 12/30/03), 864 So.2d 866, 874.
The constitutional standard for testing the sufficiency of the evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt.
In the instant case, defendant was convicted of aggravated rape which is defined in LSA-R.S. 14:42, in pertinent part, as follows:
A. Aggravated rape is a rape committed... where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
LSA-R.S. 14:2(3) defines dangerous weapon as follows:
"Dangerous weapon" includes any gas, liquid or other substance or instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm.
LSA-R.S. 14:42.1 defines forcible rape in pertinent part as follows:
A. Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:

*480 (1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
In State v. Puckett, 02-997 (La.App. 5 Cir. 1/28/03), 839 So.2d 226, 232, writ denied, XXXX-XXXX (La.12/12/03), 860 So.2d 1148, this Court discussed the differences between aggravated and forcible rape:
The definitions of aggravated and forcible rape are very similar. The only difference between the two crimes is the "degree of force employed and the extent to which the victim resists." State v. Parish, 405 So.2d 1080 (La.1981). In Parish, supra at 1087, the Louisiana Supreme Court concluded:
[I]t was the legislative aim to divide the continuum of acts of coerced sexual intercourse into two categories, aggravated rape and forcible rape, thereby assigning to the jury the function of fixing the range of permissible punishment for convicted offenders by returning a verdict which appropriately fits the crime and the degree of force employed.
Thus, it is within the province of the jury to determine the degree of force employed in a particular case and to determine whether the act constituted aggravated, rather than forcible, rape. State v. Cepriano, 00-213 (La.App. 5 Cir. 8/29/00), 767 So.2d 893, 899.
A greater degree of force is necessary to justify the more serious punishment imposed for aggravated rape. However, "there is no magic formula to determine which acts of coerced sexual intercourse warrant the greater punishment of aggravated rape rather than forcible rape. Each case must be examined on its own facts." State v. Jackson, 437 So.2d 855, 858 (La.1983).
Nonetheless, the mere fact the defendant was unarmed and the victim suffered no extensive physical pain or injury does not negate the possibility that an aggravated rape occurred. "A victim need not suffer physical harm to constitute the high degree of force necessary to support a conviction of aggravated rape." State v. Howard, 31,807 (La. App. 2 Cir. 8/18/99), 746 So.2d 49, 54, writ denied, 99-2960 (La.5/5/00), 760 So.2d 1190.
See also State v. Jackson, XXXX-XXXX (La.App. 3 Cir. 2/4/04), 866 So.2d 358, 366-367, writ denied, XXXX-XXXX (La.10/8/04), 883 So.2d 1027, and State v. Robertson, 454 So.2d 205, 209 (La.App. 1 Cir.1984), writ denied, 458 So.2d 487 (La.1984).
In the instant case, the jury could have reasonably concluded that the victim was prevented from resisting the act because defendant was armed with a dangerous weapon, to-wit, a three-pronged garden tool shaped like a fork, and that the victim was prevented from resisting the act because defendant repeatedly threatened her with death or the threat of great bodily harm accompanied by the apparent power of execution, i.e., defendant was armed with a garden tool which he implied he would use when he told her if she said anything he would kill her. The victim testified that she did not fight defendant because she was afraid, that she was fearful because of the weapon defendant had at her throat, and that it appeared to her that defendant had the ability to carry out his threats to kill her if she said anything.
Defendant claims that there was no evidence that he was armed or made any threats against the victim once they went into the rear examination room to have intercourse. However, the victim testified that she picked up the tool from the side of the "adjustment table" after he raped her. As such, the jury could have reasonably *481 concluded that the weapon was easily accessible to defendant during the perpetration of the rape.
The jury heard the testimony of the state's and defense witnesses, including the victim and her examining physician. After weighing the testimony, the jury found the testimony of the victim and her examining physician more credible than that of the defendant. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. State v. Kinsel, 00-1610 (La.App. 5 Cir. 3/28/01), 783 So.2d 532, 537, writ denied, 01-1230 (La.3/28/02), 812 So.2d 641. It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence. State v. Marcantel, 00-1629 (La.4/3/02), 815 So.2d 50, 56; State ex rel. Graffagnino v. King, 436 So.2d 559, 563 (La.1983); State v. Kinsel, supra.
Additionally, although the jury instructions are not contained in the record, the written verdict sheet indicates that the jury was given the option of finding defendant guilty of forcible rape. Also, in the exhibit envelope is a document dated June 30, 2004 with the signature of the jury foreperson which contains a question which appears to have come from the jury: "What is the definition of forcible rape?" In light of the foregoing, it appears that the jury carefully considered the distinctions between aggravated and forcible rape and unanimously chose to convict defendant of aggravated rape. See State v. Dixon, 04-1019 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 936.
Viewing the evidence in the light most favorable to the prosecution, we find that the state presented sufficient evidence such that any rational trier of fact could have found that the state proved the essential elements of the crime of aggravated rape beyond a reasonable doubt, and therefore the trial court did not err in denying defendant's motion for new trial and motion for post-verdict judgment of acquittal.
In his first allegation of error, defendant argues that the trial court erred in denying his motion to sequester the victim, thereby allowing the victim to remain in the courtroom throughout the entire proceedings. Defendant also alleges that the trial court erred by allowing the victim to sit at the table with the prosecutors "at various critical stages of the trial."
The state responds that the trial court's denial of the motion to sequester the victim was correct because a victim is not subject to sequestration under LSA-C.E. art. 615. The state further responds that the victim only briefly sat at the prosecution table after all the testimony had been heard and all the evidence had been admitted, and that the trial court sustained defendant's objection and ruled that the victim would not be allowed to sit at counsel's table.
An order of sequestration is intended to assure that a witness will testify concerning his own knowledge of the case without being influenced by the testimony of prior witnesses and to strengthen the role of cross-examination in developing facts. State v. Kimble, 407 So.2d 693, 697 (La.1981).
LSA-C.E. art. 615 sets forth in pertinent part:
A. As a matter of right. On its own motion the court may, and on request of a party the court shall, order that the witnesses be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case. In the interests of justice, the *482 court may exempt any witness from its order of exclusion.
B. Exceptions. This Article does not authorize exclusion of any of the following:
(4) The victim of the offense or the family of the victim.
In the instant case, the trial judge was authorized by LSA-C.E. art. 615 B(4) and the jurisprudence to permit the victim to remain in the courtroom throughout the proceedings. State v. Lyles, 03-141 (La. App. 5 Cir. 9/16/03), 858 So.2d 35, 48; State v. Johnson, 2001-2334 (La.App. 4 Cir. 12/4/02), 833 So.2d 508, 510-512. Additionally, the record reflects that Sgt. Darren Monie was the only witness to testify before the victim during the state's case-in-chief, and that he primarily testified that he went to Lakeside Hospital, retrieved the sexual assault kit from Dr. Wolfson, and turned that kit over to the crime scene technician. His testimony would not have influenced the victim because it did not involve matters central to the case. The trial court did not err in denying the motion to sequester the victim thereby allowing the victim to remain in the courtroom throughout the proceedings.
Defendant also alleges that the trial court erred by allowing the victim to sit at the table with the prosecutors "at various critical stages of the trial." The record indicates that, after the state and the defense rested, the jury viewed the exhibits. Following a five-minute recess, defense counsel approached the bench before the jury came back in, stating that she saw the victim sitting at counsel's table, and that the victim was not permitted to do so. The prosecutor noted the victim was not sitting at counsel's table when the doctor testified. The trial court ruled that the victim was not permitted to sit at counsel's table.
In the instant case, as was noted by the state in its brief, defendant did not contemporaneously object to the victim's sitting at counsel's table during the viewing of the evidence. According to LSA-C.Cr.P. art. 841(A),
An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.
The purpose of the contemporaneous objection rule is to give the trial judge notice of an alleged irregularity, giving the judge the opportunity to make the proper ruling and correct any alleged prejudice to the defendant. State v. Williams, 04-608 (La.App. 5 Cir. 11/30/04), 889 So.2d 1093, 1100, writ denied, XXXX-XXXX (La.4/22/05), 899 So.2d 559. Therefore, a defendant is prevented from gambling for a favorable verdict and later utilizing appellate review to correct errors that could have been corrected by the trial judge. Id.
Because defendant did not contemporaneously object to the victim's sitting at counsel's table, he failed to preserve this issue for appellate review. State v. Nellon, 04-1253, p. 4 (La.App. 5 Cir. 4/26/05), 902 So.2d 434.
Furthermore, LSA-C.E. art. 615 has been amended to remove the prohibition against a victim sitting at counsel's table. As such, there appears to be no other statutory or jurisprudential law that prevents the victim from doing so. Second, the trial judge sustained defendant's objection and ruled that the victim could not sit at counsel's table, thus giving defendant *483 the relief he desired. Third, the record reflects that the victim only sat at counsel's table for a relatively short period of time after all the testimony had been heard and all the evidence had been considered, and therefore defendant was not prejudiced. Compare State v. Fugler, 97-1936 (La.App. 1 Cir. 9/25/98), 721 So.2d 1, 9. Defendant's allegation of error is without merit.
In his second allegation of error, defendant argues that the trial court erred when it allowed the state to call the victim in rebuttal after she was allowed to remain in the courtroom throughout the proceedings. Defendant also argues in his fourth allegation of error that the trial court erred when it allowed the state to call rebuttal witnesses to introduce psychiatric, psychological, and inflammatory medical evidence when those issues were not raised by the defense in the presentation of its case. Defendant contends that it was improper for the state to deliberately withhold part of its case-in-chief and save it for rebuttal after the defense had rested. He asserts that he was denied the opportunity to address the newly raised issues.
The state responds that the trial court did not err in allowing the victim to testify in rebuttal because the victim's testimony was relevant to rebut defendant's testimony that the sex was consensual. The state further responds that it attempted to elicit this evidence during its case-in-chief, but could not once defendant's objection was sustained.
After the defense concluded its case, the trial judge asked the prosecutor if he had any rebuttal witnesses. The prosecutor responded that he was going to put the victim back on the stand. Defense counsel objected, stating that the victim had been in court and that she had testified. Defense counsel then said, "[o]kay. Depending on what she's going to testify to." The prosecutor said the victim was going to testify that defendant was lying, and that she was seeking help because she had been raped.
The trial judge stated that the prosecutor could now go into the things she would not let him go into before, because "the door has been opened." Defense counsel objected to the prejudicial effect of that information and said it did not go to his innocence or guilt and should not be admitted. The trial judge overruled the objection. The prosecutor then called Dr. Susan Glade and the victim as rebuttal witnesses.
Defendant later moved for a mistrial, arguing, inter alia, that the state should not have been allowed to have the victim sit through the entire trial and then call her on rebuttal. The trial judge denied the motion, stating in pertinent part:
... [t]he Rebuttal testimony is pretty much confined to testimony that the Court had excluded in the case in chief. That being the testimony with regard to her emotional injury; because it was not relevant on the issue of guilt until the question of consent was raised as a defense. Thereafter the treatment she sought, both from the Rape Crisis Center and from a private Psychiatrist became relevant insofar as it was a consensual act, why would she have gone to see mental health professionals ...
Defendant noted his objection.
The state has the right to rebut evidence adduced by defendant. LSA-C.E. art. 611(E). Rebuttal evidence is offered to explain, repel, counteract or disprove facts which are given in evidence by the adverse party. State v. Williams, 03-942 (La.App. 5 Cir. 1/27/04), 866 So.2d 1003, 1010, writ denied, 04-0450 (La.6/25/04), 876 So.2d 832 (citations omitted), *484 (citing State v. Parent, 02-835 (La. App. 5 Cir. 12/30/02), 836 So.2d 494, 504, writ denied, 03-0491 (La.10/31/03), 857 So.2d 472).
The trial court is vested with sound discretion in determining what constitutes valid and admissible rebuttal evidence. State v. Williams, supra. "A trial court's ruling on the admissibility of rebuttal evidence will not be disturbed, except in extreme cases, such as when the evidence was kept back deliberately for the purpose of deceiving and obtaining an undue advantage." State v. Williams, supra (citing State v. Parent, 836 So.2d at 504-505).
Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence more or less probable than it would be without the evidence." LSA-C.E. art. 401. Although relevant, evidence may be excluded if its probative value is outweighed by its prejudicial impact, will mislead the jury, or confuse the issues. LSA-C.E. art. 403. A trial judge is vested with great discretion in determining the relevance of evidence, and his ruling will not be disturbed in the absence of a clear abuse of discretion. State v. Miles, 402 So.2d 644, 647 (La. 1981).
In State v. Lambert, XXXX-XXXX (La.App. 4 Cir. 11/17/99), 749 So.2d 739, 755, writ denied, XXXX-XXXX (La.1/26/01), 781 So.2d 1258, cited by the state in its brief, defendant, who was convicted of aggravated rape, aggravated burglary, and aggravated crime against nature, claimed that the trial court erred in allowing the victim's mother to testify during redirect examination that the victim did not talk to her for two weeks after the incident, and that the victim would "draw up in a corner." Id. The appellate court found that this testimony was relevant to rebut defendant's testimony that the victim consented to intercourse. The appellate court stated that, because this evidence was relevant, it could not say that the trial judge clearly abused his discretion in failing to rule that its probative value was substantially outweighed by its possible prejudicial effect. Id.
We find that the trial court did not err in allowing the state to call rebuttal witnesses to introduce psychiatric, psychological, and medical testimony. Defendant testified that he and the victim engaged in consensual sex. As a result, evidence of the victim's emotional injuries, i.e., that she received counseling and medication after the incident, became relevant to show that the sex was not consensual. This allegation of error is without merit.
In is third allegation of error, defendant argues that the trial court erred when it allowed the victim and Dr. Susan Glade to testify in rebuttal regarding psychiatric, psychological, and medical evidence when such evidence had not been previously disclosed through discovery.
Criminal discovery rules are intended to eliminate unwarranted prejudice which arises from surprise testimony and evidence in order to permit the defense to respond to the state's case and allow the defense to properly assess the strength of the state's case. State v. Williams, 03-942 (La.App. 5 Cir. 1/27/04), 866 So.2d 1003, 1010, writ denied, 04-0450 (La.6/25/04), 876 So.2d 832 (citations omitted).
Except as expressly provided by LSA-C.Cr.P. art. 723, a defendant in Louisiana is not entitled to the discovery of reports, memoranda, or other internal state documents which are made by the district attorney or agents of the state, nor is he entitled to witnesses' statements made to the district attorney or agents of the state. State v. Dunn, 94-776 (La.App. 5 Cir. 2/15/95), 651 So.2d 1378, 1383.
*485 However, on motion of defendant, LSA-C.Cr.P. art. 718 provides for discovery of documents and tangible evidence within the state's possession, custody or control when the items sought: (1) are favorable to the defendant and material and relevant to his guilt or punishment; (2) are intended for use by the state as evidence at trial; or (3) were obtained from or belong to the defendant. State v. Williams, supra (citation omitted). Discovery is not limited, however, to evidence contained in the district attorney's file. State v. Williams, supra (citing State v. Lee, 531 So.2d 254 (La.1988)).
Defendant has the right, upon motion, to inspect and copy reports of physical or mental examinations or scientific tests in the possession of the state and intended for use at trial. LSA-C.Cr.P. art 719. However, the state has no obligation to disclose information that it does not possess. State v. Small, 29,137 (La.App. 2 Cir. 4/2/97), 693 So.2d 180, 191. The state has a continuing duty to disclose additional evidence which it discovers or decides to use at trial. LSA-C.Cr.P. art. 729.3.
LSA-C.Cr.P. art. 729.5(A) provides:
If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this Chapter or with an order issued pursuant to this Chapter, the court may order such party to permit the discovery or inspection, grant a continuance, order a mistrial on motion of the defendant, prohibit the party from introducing into evidence the subject matter not disclosed, or enter such other order, other than dismissal, as may be appropriate.
A conviction is only reversible when the defendant is prejudiced as a result of the discovery violation. State v. Zapata, 97-1230 (La.App. 5 Cir. 5/27/98), 713 So.2d 1152, 1162, writ denied, 98-1766 (La.11/6/98), 727 So.2d 443.
In the instant case, during cross-examination of the victim on rebuttal, the victim testified that: (1) she did not have medical reports or records from Lakeside Hospital to show that she had gonorrhea; (2) she did not have medical reports or records from Planned Parenthood to show that she no longer had gonorrhea; (3) she did not remember whether she told the prosecutor that she had gonorrhea or whether he read it in one of the reports; (4) she never received her medical records from Lakeside Hospital; (5) the YWCA did not keep records of her counseling visits; (6) she filled out papers at the YWCA, but did not have them with her; (7) she did not provide the prosecutor with any of that information; (8) she received a report from Consuelo at the Rape Crisis Center; however, she did not provide the prosecutor with a copy of it and she did not have it with her at trial; and (9) the Rape Crisis Center did not keep personal records on rape victims. The record further reflects that the state did not introduce any medical, psychological, or psychiatric records or reports into evidence at trial, other than the medical information contained in the JPSO "Consent for Examination and Treatment" form. In light of the victim's testimony and the record, it appears that the state did not have in its possession any medical, psychological, or psychiatric reports or records from Dr. Susan Glade, the Rape Crisis Center, the YWCA, Lakeside Hospital, or Planned Parenthood to give to defendant during discovery. Therefore, it appears that there were no discovery violations regarding these records.
Even if there had been a discovery violation regarding these records, the effects of such may be remedied by effective cross-examination. State v. Small, *486 29,237 (La.App. 2 Cir. 4/2/97), 693 So.2d 180, 191. During the cross-examination of Dr. Glade, defense counsel elicited the fact that the victim only saw Dr. Glade three times for less than an hour each time, suggesting to the jury that Dr. Glade had not spent enough time with the victim to make an accurate diagnosis. During the cross-examination of the victim, defense counsel pointed out that the victim had no records to prove her allegations that she received counseling at the Rape Crisis Center or the YWCA, or that she contracted gonorrhea after the incident, thus casting doubt on the victim's allegations.
Additionally, according to LSA-C.Cr.P. art. 723, the state was not required to provide defendant with witnesses' statements. Also, rebuttal evidence is not subject to pretrial discovery. See, State v. Williams, 866 So.2d at 1011.
We find that the trial court did not err when it allowed Dr. Susan Glade and the victim to testify in rebuttal regarding psychiatric, psychological, and medical evidence when such evidence had not been previously disclosed throughout discovery.
In his fifth allegation of error, defendant argues that the trial court erred when it allowed the state to elicit testimony from Drs. Wolfson and Glade regarding the "truthfulness" of the victim's allegations of rape.
Defendant did not brief or argue this assignment on appeal and, as such, it is considered abandoned on appeal. State v. Blank, 01-564 (La.App. 5 Cir. 11/27/01), 804 So.2d 132, 139. In addition, defendant did not contemporaneously object to this testimony and, therefore, he has failed to preserve this issue for appellate review. State v. Nellon, supra.
In his sixth allegation of error, defendant argues that the trial court erred when it overruled the defense's objection to the state's last minute disclosure of its intent to introduce evidence of certain oral statements where the defense timely requested notice of those statements and was not afforded an opportunity to determine whether those statements were subject to the procedural safeguards afforded an accused under the United States and Louisiana Constitutions. Defendant did not brief this claim.
In his eight allegation of error, defendant alleges that the trial court erred when it failed to suppress the state's DNA evidence where irregularities in the testing protocol were demonstrated and the state did not provide the defense with the samples needed to conduct independent testing to develop countervailing DNA evidence. Again, defendant has failed to brief this claim and, further, did not specify the irregularities to which he generally refers in brief. There is nothing in the record to indicate that defendant moved or sought to have the DNA evidence tested independently.
In his last allegation of error, defendant argues that the trial court erred when it failed to allow the defense to inform the prospective jurors during voir dire that a conviction for the offense of aggravated rape carries a mandatory sentence of life imprisonment. Defendant also failed to brief or argue this assignment.
Assignments of error neither briefed nor argued are considered abandoned on appeal. State v. Blank, supra. Accordingly, we decline to address these issues.
In his seventh allegation of error, defendant argues that the trial court erred when it did not find that the state had failed to timely disclose exculpatory evidence related to the victim's psychiatric and psychological *487 history immediately prior to the alleged incident which included treatment for use and abuse of certain scheduled prescription drugs.
The state responds that defendant's claim is factually incorrect in that the trial testimony did not indicate that the victim was under treatment for psychiatric problems or substance abuse at the time of the alleged rape. The state further responds that defendant had the opportunity to cross-examine the victim regarding the allegations of prior drug abuse and did so.
In State v. Deruise, XXXX-XXXX (La.4/3/01), 802 So.2d 1224, 1238, cert. denied, 534 U.S. 926, 122 S.Ct. 283, 151 L.Ed.2d 208 (2001), the Louisiana Supreme Court discussed the law regarding exculpatory evidence as follows (footnotes added):
In Brady, the Supreme Court held that the suppression by the prosecution of evidence favorable to the accused violates a defendant's due process rights where the evidence is material either to guilt or punishment, without regard to the good or bad faith of the prosecution.[3] 373 U.S. at 87, 83 S.Ct. at 1196-1197. The Brady rule encompasses evidence which impeaches the testimony of a witness when the reliability or credibility of that witness may be determinative of guilt or innocence. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 765, 31 L.Ed.2d 104 (1972); State v. Knapper, 579 So.2d 956, 959 (La.1991). Still, Brady and its progeny do not establish a general rule of discoverability. A prosecutor does not breach his constitutional duty to disclose favorable evidence "unless the omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976).
For purposes of Brady's due process rule, a reviewing court determining materiality must ascertain not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) (citing Bagley, 473 U.S. at 678, 105 S.Ct. at 3381); Strickland, 683 So.2d at 234 (citing State v. Marshall, 94-0461, p. 14 (La.9/5/95), 660 So.2d 819, 825).[4] Thus, the reviewing court does not apply an outcome-determinative test; rather, a Brady violation occurs when the court finds that the "evidentiary suppression `undermines confidence in the outcome of the trial.'" Kyles, 514 U.S. at 434, 115 S.Ct. at 1566 (quoting Bagley, 473 U.S. at 678, 105 S.Ct. at 3381).
In the instant case, Dr. Glade testified that the victim had not been in treatment before, but that the victim had told her she had used and abused Lorcet and Vicodin briefly when she was 24 years old. Dr. Glade testified that the victim was born in December of 1977. Therefore, at the time of the incident on September 25, 2003, the victim was approximately three months away from her 26th birthday. Also, the victim testified that she had problems with drugs "a couple of years ago; a long time ago," and not anytime lately.
We find that the state had no exculpatory evidence to produce as the record *488 reflects that the victim was not undergoing psychological or psychiatric treatment immediately prior to the incident. Additionally, defendant had the opportunity to cross-examine the victim regarding her prior drug abuse and did so. We find no merit to this allegation of error.
We have reviewed that record for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La. App. 5 Cir.1990). The review reveals errors in this case.
Because defendant was convicted under LSA-R.S. 14:42, a "sex offense" as defined by LSA-R.S. 15:541(14.1), notification of the sex offender registration requirements is mandated. LSA-R.S. 15:540 et seq. However, the record does not indicate that the trial judge provided defendant with notification of the registration requirements of LSA-R.S. 15:542 as required by LSA-R.S. 15:543(A). Therefore, we remand the case and order the trial court to inform defendant of the registration requirements of LSA-R.S. 15:542 by sending appropriate written notice to defendant within ten days of this opinion, and to file written proof in the record that defendant received such notice. State v. Hotard, 03-435 (La.App. 5 Cir. 12/30/03), 864 So.2d 748, 758.

CONCLUSION
For the above discussed reasons, the defendant's conviction and sentence are affirmed. The case is remanded for the trial court to inform defendant of the registration requirements of LSA-R.S. 15:542 by sending appropriate written notice to defendant within ten days of this opinion, and to file written proof in the record that defendant received such notice.
AFFIRMED AND REMANDED.
NOTES
[1] In accordance with LSA-R.S. 46:1844, the victim will be referred to by the use of initials in order to protect her identity. State v. Myles, 04-677 (La.App. 5 Cir. 1/25/05), 894 So.2d 515, 518.
[2] Jefferson Parish Sheriff's Office (JPSO) Sergeant Robert Harrison testified that he was a 911 supervisor and that he had been called upon by the district attorney's office to reproduce a series of 911 and dispatch calls regarding the September 25, 2003 incident. The tape of the 911 calls and dispatches was played for the jury.
[3] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[4] State v. Strickland, 94-0025 (La.11/1/96), 683 So.2d 218.