# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**06-624**

**STATE OF LOUISIANA**

**VERSUS**

**J.M.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 11735-03
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, J. David Painter, and James T. Genovese, Judges.

**CONVICTIONS AFFIRMED; SENTENCES VACATED; REMANDED FOR RESENTENCING.**

John Foster DeRosier
District Attorney - 14th Judicial District Court
P. O. Box 3206
Lake Charles, LA 70602-3206
Telephone: (337) 437-3400
COUNSEL FOR:
    Plaintiff/Appellee - State of Louisiana

Mitchell P. Bergeron
Public Defender's Office
120 West Pujo Street - Suite 201
Lake Charles, LA 70601
Telephone: (337) 436-1718
COUNSEL FOR:
    Defendant/Appellant - J.M.

THIBODEAUX, Chief Judge.

Defendant, J.M.[1], appeals his jury convictions and trial court sentences for two counts of aggravated incest and one count of attempted aggravated incest. He was sentenced as follows:

> [D]efendant, [J.M.], is hereby ordered to serve as to each count of aggravated incest, ten years with the Department of Corrections to run concurrent of which six years on each count is suspended. You will serve four years on each count consecutive to one another before being eligible for release.
>
> With regard to the attempted aggravated incest, you are ordered to serve five years with the Department of Corrections consecutive to the ten years on each of the other counts of which three years are suspended and you will serve those two years balance consecutive to the other eight years for the two counts of aggravated incest.
>
> In other words, you will serve a total of ten years with the Department of Corrections and there will be 15 years that have been suspended.

Defendant was also ordered to pay a fine, court cost, and restitution to the victims.

We affirm Defendant's convictions. We vacate his sentences, however, and remand for resentencing.

## ISSUES

Defendant is now before this court on appeal, alleging four errors: insufficient evidence to sustain the verdicts, erroneous denial of Defendant's request that the victims be sequestered, erroneous imposition of consecutive sentences, and excessiveness of the sentences.

---

[1] Because the victims are minors, initials of the parties will be used to protect the victims' identities. La.R.S. 46:1844(W).

## LAW AND DISCUSSION

### Insufficiency of the Evidence

Defendant argues that the inconsistencies which existed within the three victims' initial interviews with the Children's Advocacy Center counselor and the inconsistencies within their testimonies given at trial were such that it was inconceivable the jury would find Defendant guilty beyond a reasonable doubt. Defendant further argues that the State failed to prove all of the elements of the crimes of aggravated incest and attempted aggravated incest, and that the State failed to show that the offenses occurred in the time frame alleged in the indictment.

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559, (La.1983); *State v. Duncan,* 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). The role of the factfinder is to weigh the respective credibility of each witness. Therefore, the appellate court should not second guess the credibility determinations of the factfinder beyond the sufficiency evaluations under the *Jackson* standard of review. See *State ex rel. Graffagnino*, 436 So.2d 559, citing *State v. Richardson*, 425 So.2d 1228 (La.1983).

*State v. Miller,* 98-1873, p. 5 (La.App. 3 Cir. 10/13/99), 746 So.2d 118, 120, *writ denied*, 99-3259 (La. 5/5/00), 761 So.2d 541.

Defendant was convicted of two counts of aggravated incest committed against Ja.P. and Je.P. and one count of attempted aggravated incest committed against S.F. Louisiana Revised Statutes 14:78.1, in the relevant parts, provides:

> A.   Aggravated incest is the engaging in any prohibited act enumerated in Subsection B with a person who is under eighteen years of age and who is known to the offender to be related to the offender as any of the following biological, step, or adoptive relatives:  child,

2

grandchild of any degree, brother, sister, half-brother, half-sister, uncle, aunt, nephew, or niece.

B. The following are prohibited acts under this Section:

. . . .

(2) any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child, the offender, or both.

The attempt statute, La.R.S. 14:27, provides, in part:

A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

Moreover, in *State v. Arwood*, 00-152, pp. 6-7 (La.App. 5 Cir. 6/27/00), 762 So.2d 1266, 1270, the fifth circuit stated:

In order to support a conviction for attempted aggravated incest, the State is required to prove that the defendant specifically intended to engage in an act listed in Subsection B of LSA-R.S. 14:78.1 with his daughter. Such proof is indispensable, as specific intent to accomplish the offense is the *sine qua non* of the criminal offense of attempt. *State v. Trackling*, 609 So.2d 206, 207 (La.1992). Specific intent is a state of mind and as such need not be proven as a fact, but may be inferred from the circumstances and actions of the accused. See *State v. Graham*, 420 So.2d 1126, 1128 (La.1982); and *State v. Lewis*, 698 So.2d 456, 459 (La.App. 5 Cir.1997), *writ denied*, 716 So.2d 881 (La.1998).

At trial, the only direct evidence presented of Defendant's guilt were the testimonies of the three victims and the videotapes made during the interviews conducted by the Children's Advocacy Center a short time following the victims' disclosures to the police of Defendant's acts.

At trial, J.P., the adoptive father of two of the victims, testified that he was alerted to a problem by S.F.'s mother, L.C.F. She had called J.P. and asked him

3

if he knew why S.F. insisted that she did not want to visit with Defendant. J.P. had also noticed that his daughters were making up excuses not to visit with their grandfather. After he had talked to S.F.'s mother, he asked the two girls why S.F. did not want to visit Defendant. The oldest, Je.P., then told him that their grandfather had been touching S.F. She told him that their grandfather had been touching Je.P. and Ja.P., too.

L.C.F. testified that after J.P. called her and told her what his girls were saying, she did not confront S.F. directly because she wanted S.F. to tell her first. L.C.F. said she kept asking S.F. why she was mad at Defendant. Finally, S.F. told her about the touching.

The allegations were reported to Mike Primeaux, a detective with the Calcasieu Parish Sheriff's Office sex crimes unit, on or about December 2, 2002. He arranged and monitored the taped interviews of the girls at the Children's Advocacy Center.

Je.P. was interviewed on December 27, 2002. Je.P., who was twelve at the time, told about an incident that involved herself and Ja.P., which took place in Defendant's greenhouse while they played "Doctor." She stated that he was the doctor, and that she and Ja.P. took turns being the patient. She said that while she sat on a workbench, Defendant examined a "bobo" on her thigh. He then reached up the pant leg of her shorts and touched her in the "bad place." Je.P. indicated, on a drawing of a nude child, that the "bad place" was the genital area. She stated that when it was Ja.P.'s turn to be the patient, she saw him touch Ja.P. in the same "bad place." Je.P. said that she and Ja.P. ran into the house and locked themselves in a back bedroom and called their father to come and get them. She said that Defendant did not want them to call. Je.P. also stated that she had seen him touch Ja.P. another

4

time while Ja.P. was sitting on the couch at Defendant's house watching television. She also said that Defendant made her watch a "dirty movie" of people doing things without their clothes on. During the interview, Je.P. was unclear about how many times Defendant had touched her and the other two girls.

Je.P. was fifteen at the time of trial. At trial, Je.P.'s testimony was fairly consistent with the information she gave at the interview, except that she testified that S.F. was with her and her sister during the incident in the greenhouse. However, she later testified that S.F. was not in the greenhouse on that particular occasion.

Ja.P. was ten years old at the time of the interview at the Children's Advocacy Center. She told of playing "Doctor" in the greenhouse with Defendant and S.F. She thought she was seven at the time of the incident. She described how Defendant was the doctor and she was the patient and that she had a "bobo" on her leg that needed fixing. She said that he made her take her pants down. She was unclear as to whether he touched her under or over her panties. She indicated on a drawing of a nude child that he touched her on her genital area. She stated that he made her and S.F. go into the greenhouse with him. She also stated that S.F. had told her that she saw Defendant touch Je.P. She further related a time when they played "Truth or Dare," and Defendant wanted them to dare him to take his clothes off. She said he wanted them to "do something," but they refused and locked themselves in the back bedroom. She said that Defendant threatened them, "like burn the house or shoot us." She talked about him touching them while they were on a swing, and that he would not take them home when they asked. (Ja.P. was not always clear on who was with her, Je.P. or S.F., or both). She described the "dirty movie" he made her and the other girls watch. She said the movie was of people in bed. She stated that

Defendant asked them to do what the people were doing. She said that he hid the movie in the laundry room.

Ja.P. was thirteen when she testified at trial. She testified that incidences of playing "Doctor" in the greenhouse happened several times with her and the other two girls and that Defendant touched them over and under their panties. She remembered Defendant making threats if they told, but could not recall what threats he made. She also recalled watching the "dirty movie" in the living room. Later, she stated that the touching happened to her and S.F. several times but that she was unsure whether it happened to Je.P. more than once.

S.F. was ten at the time of the interview. At the beginning of the interview, S.F. stated that "something happened" several times when she was eight. When she was asked what the something was, she hung her head and would not speak. When asked where something might have happened, she asked to write it down. S.F. then made a list of four places where something happened and who was there when it happened. Eventually, she said that one night when she and Ja.P. were at Defendant's house, he put his hand on her lap on top of her "private part." S.F. indicated on a drawing of a nude girl that he touched her on her genital area. She said that one time, after she had used the bathroom in his bedroom, he asked her to take off her clothes. S.F. described the greenhouse and told of playing "Doctor." She described how he pulled Je.P.'s shorts down and touched Je.P. on her "private part." She described the movie that he made them watch. She said that there were nasty people in the movie who did not have any clothes on. She said that Defendant kept the movie in the laundry room.

At trial, S.F., who was thirteen then, described how Defendant was always the doctor when they played. She described how he would pretend to fix the

6

"upper part" of her legs, and then he would touch her "private part" under her pants but over her panties. She stated that she saw him touch Ja.P. in the same manner. She also saw him touch Ja.P. while Ja.P. was sitting on the couch watching television. She described the game of "Truth or Dare" she had discussed in the taped interview, but this time she said that he wanted her and Ja.P. to kiss each other, and when they refused, he got mad at them. She also described the pornographic videotape she was made to watch.

Defendant testified at trial. He adamantly denied all the allegations. He admitted that he played "Doctor" with the girls, but denied that he touched them as they claimed. He denied that he showed them a pornographic movie. He stated that he has never had a pornographic tape in his house. He stated that he believed J.P. put the sisters up to lying because J.P., who he claimed was unable to have his own children, was fearful of him coming between the two girls and their adoptive father. He stated that S.F. lied so she could be with the other two girls.

Defendant's wife and daughter also testified. Neither of them had noticed any problems with the three girls and their grandfather.

In brief, Defendant points to several inconsistencies in the girls' testimonies at trial and with the statements made at the Children's Advocacy Center. The inconsistencies were of who was touched in whose presence and when and where they were touched. As an example, Defendant points to Je.P.'s videotaped statement that Defendant touched her first when she, Ja.P., and Defendant were playing Doctor in the greenhouse. At trial, she indicated that he played Doctor with Ja.P. first. Furthermore, during the videotaped interview, S.F. did not include the greenhouse on her list of places where she was when Defendant touched her.

Defendant argues that "law enforcement officers and the Child Advocacy counselor" failed to "properly investigate this case to confirm or deny certain facts" and that this compounded the problem. At trial, Detective Primeaux admitted that he did not obtain a search warrant for Defendant's house to locate the alleged pornographic tape. Further, Defendant points to the fact that there was no medical evidence of sexual abuse submitted at trial.

However, at trial, Detective Primeaux testified that he did not ask for medical examinations because the victims had all indicated that Defendant had touched them on their genital areas but did not indicate any penetration. "In the case of sexual offenses, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific or physical evidence to prove the commission of the offense." *State v. Roca*, 03-1076, pp. 11-12 (La.App. 5 Cir. 1/13/04), 866 So.2d 867, 874, *writ denied,* 04-0583 (La. 7/2/04), 877 So.2d 143.

While there were inconsistencies in the girls' statements as to where exactly, when exactly, and who was present when the activity occurred, the salient facts were consistently presented: playing Doctor where only Defendant was the doctor, a pretended problem with the victims' upper legs, the dirty movie that showed naked people in bed, the tape hidden in the laundry room, and the game of "Truth or Dare" where Defendant wanted the girls to take off their clothes or that they dare him to take off his clothes. At trial, Defendant admitted that he played Doctor once with the girls in the greenhouse. He testified that he had actually moved them from the greenhouse to the back of his truck because of all the pesticides in the greenhouse. He testified that he had gotten an old stethoscope from his wife and used that instrument during their play. Defendant's wife corroborated his testimony regarding

the stethoscope. However, none of the girls mentioned a stethoscope or playing Doctor in the back of Defendant's truck either during the interview with the Child Advocacy counselor or at trial.

Defendant further argues that the State failed to establish that the incidences occurred between January 1, 2001, and December 19, 2002, as alleged in the indictment. Testimony at trial and information asserted in the videotapes indicate that the inappropriate touching happened on a continuing basis. Je.P., whose birth date was in November 1990, had just turned twelve prior to the interview with the Children's Advocacy Center. She indicated that the incident in the greenhouse happened when she was about nine years of age, which would have put the date within a month or two of January 2001. Both sets of parents testified that in 2002, the girls had began to be reluctant to visit with their grandfather. Moreover, "[t]he date of the offense is not a specific element of aggravated incest." *State v. Foshee,* 99-1423, p. 6 (La.App. 3 Cir. 4/5/00), 756 So.2d 693, 696.

Finally, Defendant asserts that the State failed to prove the element of "intent to arouse or to satisfy the sexual desires of either the child, the offender, or both." La.R.S. 14:78.1(B)(2). The State does not have to prove actual arousal, only the intent to arouse. *State v. Rollins*, 581 So.2d 379 (La.App. 4 Cir. 1991). "Specific intent is a state of mind and as such need not be proven as a fact, but may be inferred from the circumstances and actions of the accused." *State v. Harris,* 99-1288, p. 7 (La.App. 5 Cir. 1/24/01), 782 So.2d 1055, 1059, *writ denied*, 01-0485 (La. 1/25/02), 806 So.2d 668. In *Arwood*, 762 So.2d 1266, the defendant was convicted of attempted aggravated incest. The fifth circuit found that there was sufficient evidence of the defendant's intent to arouse or satisfy his sexual desire. The victim, the daughter of the defendant, testified that her father would get into the bathtub with her

and touch her private parts with his hand. He would sleep naked with her and pull her shirt up and lay on top of her.

In the current case, the facts presented at trial indicated a continuous and planned activity. All of the victims testified that they were forced to watch a pornographic movie. One of the victims reported that they were asked to take off their clothes, and when they refused, Defendant became angry. Moreover, Defendant was always the "Doctor," indicating control of the girls. There was sufficient evidence of Defendant's intent to sexually gratify himself.

Finally, "[i]n the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the court, is sufficient to support a conviction or convictions." *State v. Stec*, 99-633, pp. 4-5 (La.App. 5 Cir. 11/30/99), 749 So.2d 784, 787. There was sufficient evidence on which the jury could reasonably find Defendant guilty of the crimes of aggravated incest and attempted aggravated incest. There is no merit to this assignment of error.

**Sequestration of the Victims**

Defendant asserts that the trial court committed reversible error when it denied his requests at trial to sequester the victims. In brief, Defendant argues:

> The alleged victims, Je.P., Ja.P., and S.F., were allowed to stay in the courtroom while each other were testifying. Even if it is conceded that a victim may have the right to be in the courtroom while their claims are being discussed, it is contended that right would not allow them to be in the courtroom while other victims' claims are being discussed and when the other parties are not family. Although two of the victims, Je.P. and Ja.P., were sisters, the third victim, S.F., was not related to these parties.

The Louisiana Code of Evidence Article 615, in pertinent part, provides:

> A. **As a matter of right**. On its own motion the court may, and on request of a party the court shall, order that the witnesses be excluded from the courtroom or from

a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case. In the interest of justice, the court may exempt any witness from its order of exclusion.

B. Exceptions. This Article does not authorize exclusion of any of the following:

. . . .

(4) The victim of the offense or the family of the victim.

On the morning of trial, Defendant asked that the victims be excluded from the courtroom during each other's testimony. Defendant asserted that his right to proper cross-examination would be violated because the victims could feed off one another or look to each other for support throughout the testimony. The trial court denied Defendant's request, stating that it had no authority to exclude the victims and their families. Moreover, the trial court noted that the videotapes would show any discrepancies in the testimonies.

In *State v. Johnson*, 01-2334, p. 5 (La.App. 4 Cir. 12/4/02), 833 So.2d 508, 511, the defendant complained because one of the two victims he robbed was allowed to remain in the courtroom during the other victim's testimony. Finding that the defendant's right to effective cross-examination was not violated, the fourth circuit held:

> Further, the purpose of a sequestration order is to prevent a witness from hearing or learning of the testimony of the other witnesses before he takes the stand, preventing the witness from deliberately tailoring his testimony to that of other witnesses. A sequestration order is also intended to exclude conscious and subconscious influence by one witness upon another. An order sequestering the witnesses is designed to do two things: (1) insure that a witness will testify from to [sic] his own knowledge of the case without being influenced by the testimony of another witness and (2) strengthen the role of cross-examination in developing facts. *State v. Kimble*, 407 So.2d 693 (La.1981).

In this case, the record shows that Thuy Trinh's testimony was not influenced by her mother's testimony, and that the defendant's ability to cross-examine Thuy Trinh was not undermined. Thuy Trinh's testimony at the motion hearing was identical to the information she provided Detective Deiringer on the day of the offense.

See also, *State v. McGinnis,* 04-1286 (La.App. 5 Cir. 10/06/05), 917 So.2d 471, *writ denied*, 05-2469 (La. 4/28/06), 927 So.2d 283, where the fifth circuit held that it was not error for the trial court to have denied the defendant's request to sequester the victim.

As noted by the trial court in the present case, the victims' testimonies at trial were essentially corroborated by the videotapes made at the Children's Advocacy Center and each other. While there were minor deviations from the facts alleged, there was nothing to indicate that the victims were testifying in support of or influenced by each other's testimony. This assignment of error is without merit.

**Concurrent Versus Consecutive Sentences and
Excessiveness of the Sentences**

Errors number three and four concern the consecutive application of the sentences and question whether the sentences were excessive under the circumstances of the case. However, as noted in the Errors Patent section below, the sentences must be vacated. Therefore, a discussion of these issues is not necessary.

**ERRORS PATENT**

After reviewing the record, we find several errors patent which require that the sentences imposed be vacated. First, Defendant's sentences are illegal. Initially, the trial court stated that any sentences it imposed would be consecutive; however, it then stated that Defendant's ten-year sentences on each count of aggravated incest would run concurrently. Later, the trial court stated that the

12

probationary periods of five years would also run concurrently. These sentences are thus indeterminate and require that the case be remanded for resentencing.

Second, the trial court failed to set the amount of restitution to be paid to the victims. In ordering restitution be paid, the trial court stated:

> You will be required to make restitution to each of the victims according to amounts that are submitted for any counseling and treatment as provided for by law. Those amounts will be submitted to the Office of Probation and Parole and be made a part of your payment schedule. I believe we will have a feeling for what those total amounts will be by the time that you're released.

In *State v. Joseph*, 05-186, pp. 2-3 (La.App. 3 Cir. 11/2/05), 916 So.2d 378, 380, this court stated:

> This court has held that when a trial court fails to state the amount of restitution owed as a condition of probation, the sentence is illegal and the case must be remanded for resentencing. *State v. Dauzat*, 590 So.2d 768 (La.App. 3 Cir.1991), *writ denied*, 598 So.2d 355 (La.1992), *cf. State v. Randle*, 02-309, 02-310 (La.App. 3 Cir. 10/2/02), 827 So.2d 657.

Thus, at resentencing, the trial court should be instructed to set the amount of restitution to be paid to each victim.

Third, the trial court failed to establish a payment plan for the payment of the $1,500 fine, court costs, and the $500 reimbursement to the Indigent Defender Board. The trial court stated that the fine and court costs were to be "spread out over the 60 months of [his] supervised probation on a schedule to be worked out by Probation and Parole and approved by [the] court." This court has previously found such a statement insufficient to establish a payment plan. *See State v. Thomas*, 05-1051 (La.App. 3 Cir. 3/1/06), 924 So.2d 1146, and *State v. Brack*, 99-1103 (La.App. 3 Cir. 3/1/00), 758 So.2d 310. Thus, we order the trial court to establish a payment plan for any fees imposed as conditions of probation at the resentencing proceeding.

A payment plan is also required for any restitution ordered as a condition of probation. *See State v. Morris*, 05-725 (La.App. 3 Cir. 12/30/05), 918 So.2d 1107.

## CONCLUSION

The evidence was sufficient to sustain the guilty verdicts on two counts of aggravated incest and one count of attempted aggravated incest beyond a reasonable doubt. Furthermore, the trial court did not err when it denied Defendant's request to sequester the victims during each others' testimonies. Accordingly, we affirm Defendant's convictions. However, because of the indeterminate nature of the sentences and the lack of a payment plan for the fines, court costs, and restitution ordered, the sentences are vacated, and this matter is remanded to the trial court for resentencing in accordance with this opinion.

**CONVICTIONS AFFIRMED; SENTENCES VACATED; REMANDED FOR RESENTENCING.**